104

THE NEW HAMPSHIRE RETIREMENT SYSTEM

v.

JOHN H. SUNUNU & a.

February 15, 1985

*Sheehan, Phinney, Bass & Green P.A.,* of Manchester (*Alan P. Cleveland* on the brief and orally), for the plaintiff.

*Gregory H. Smith,* attorney general (*Bruce E. Mohl* and *Ronald F. Rodgers,* assistant attorneys general, on the brief, and *Mr. Mohl* orally), for the Governor and Council.

*William P. Briggs,* of Concord, by brief and orally, for the intervenor State Employees' Association of New Hampshire.

*McLane, Graf, Raulerson & Middleton P.A.,* of Manchester (*Jack B. Middleton* and *David M. Howe* on the brief, and *Mr. Middleton* orally), for intervenors National Education Association of New Hampshire & a.

*Barto & Gfroerer,* of Concord (*Michael G. Gfroerer* on the brief), by brief for intervenors New Hampshire Police Association & a.

*Richard F. Therrien,* of Manchester, by brief for intervenor New Hampshire Permanent Firefighters Association.

*Brown & Nixon,* of Manchester, and *Fried, Frank, Harris, Shriver & Jacobson,* of New York, New York (*David L. Nixon & a.* on the brief, and *Beverly Ross Campbell* orally), for Service Employees International Union, as amicus curiae.

KING, C.J. The plaintiff, the New Hampshire Retirement System (the System), brought a petition for a declaratory judgment in superior court against John H. Sununu, as Governor of the State of New Hampshire, and five members of the Governor's Council. All parties moved for summary judgment, and the Superior Court (*O'Neil,* J.) transferred two questions of law to this court: "[W]hether the New Hampshire Retirement System is an agency or department within the executive branch of state government, and, even if it is, whether under RSA 4:15 and [former RSA] 8:13, V [current version at RSA 21-I:8, I(b) (Supp. 1983)], it must submit personal service contracts to Governor and Council for its [sic] approval."

We answer the first question by concluding that the System is an incorporated pension trust that is independent of the executive branch and therefore need not submit its personal service contracts to the Governor and Council for review. As a result of our answer to the first question, we do not reach the second question.

The material facts in this case are not disputed. The System since its inception in 1967 has never sought approval of its contracts by the Governor and Council until the events leading to this action. On April 21, 1983, following advice from the attorney general's office, the System's executive secretary submitted two of the System's personal service contracts to the Governor and Council for their approval. One of the contracts was with Evaluation Associates, Inc., an investment management consultant, and the other contract was with State Street Research & Management Company, a bond investment manager. On May 4, 1983, the Governor and Council requested more information on the contracts.

The System's trustees, however, instructed the executive secretary that all such contracts would continue to go to the trustees for their sole action and approval, that no further contracts would be submitted to the Governor and Council for their approval, and that the two contracts presented to the Governor and Council should be returned to the System as its property. The executive secretary advised the Governor and Council of the trustees' position. The attorney general advised the Governor and Council that, pursuant to RSA 4:15 and former RSA 8:13, V (current version at RSA 21-I:8, I(b) (Supp. 1983)), State agencies are required to submit all personal service contracts involving in excess of $500 for approval by the Governor and Council and that the System as a State governmental agency is required to submit such contracts for approval. The Governor and Council responded by demanding that all existing personal service contracts of the System be delivered forthwith to the Governor and Council for their action.

In an attempt to resolve the jurisdictional dispute over the System's letting of contracts involving more than $500, a series of meetings took place among the trustees of the System, the Governor, and the members of the Governor's Council. During the course of these meetings, the trustees maintained that under RSA chapter 100-A they were obligated to administer the System as an incorporated pension trust for the benefit of the System's members and beneficiaries and not as a State agency accountable to the Governor and Council. After these efforts to resolve the dispute proved unsuccessful, the System brought a petition for declaratory judgment in the superior court.

We begin our analysis with a review of RSA chapter 100-A, which established the System. The legislature created the System on July 1, 1967, as an entity having "the powers, privileges and immunities of a corporation," see RSA 100-A:2, superseding former RSA chapter 100, a statute that created a retirement system for State employees in 1945. RSA chapter 100-A merged four predecessor retirement

systems that had existed for State employees, teachers, policemen, and firemen. *See* RSA 100-A:1, XXVIII.

Under RSA chapter 100-A, the System provides benefits for service retirement, disability retirement and accidental death to eligible members and beneficiaries. RSA 100-A:5, :6, and :8 (1977 and Supp. 1983). The funds of the System are held "in trust" for the purpose of paying these benefits. RSA 100-A:2. The benefits are financed by contributions from employees and employers, *see* RSA 100-A:16 (1977 and Supp. 1983), and from investment return on the accumulated funds of the System. *See* RSA 100-A:15, I (Supp. 1983) (trustees have power to invest System's funds).

The administration of the System is vested in an eleven person board of trustees which consists of two State employees, two teachers, two policemen, two firemen, the bank commissioner as an ex-officio member, and two non-member trustees appointed by the Governor and Council. RSA 100-A:14, I (Supp. 1983). The board may hire employees and acquire actuarial, medical and similar services in order to transact the System's business. RSA 100-A:14, V (Supp. 1983). The board may also promulgate rules and regulations necessary to administer the System. RSA 100-A:14, II.

The board of trustees is given full power over the trust by RSA 100-A:15 (Supp. 1983). Its members serve as the trustees of funds created by RSA chapter 100-A and have "full power to invest, and reinvest such funds," subject to the legal restrictions that New Hampshire places on the investments of domestic life insurance companies. RSA 100-A:15, I (Supp. 1983). The trustees also have "full power to hold, purchase, sell, assign, transfer and dispose of any of the securities and investments in which any of the funds . . . have been invested . . . ," RSA 100-A:15, I (Supp. 1983), and "full power and authority" to delegate to an agent their power and discretion to make decisions and actions regarding investments. RSA 100-A:15, I(a) (Supp. 1983).

In determining whether or not the System is an executive department or agency subject to ordinary fiscal constraints, *see* RSA 4:15 (expenditure of moneys by department of State government subject to approval of "governor, with the advice of the council"); RSA 21-I:8, I(b) (Supp. 1983) (department of administrative services may review "all state contracts"), we note that, as a preliminary matter, the concept of a legislatively created entity independent of the executive branch is not at all novel. *See* RSA 204-C:2 (Supp. 1983) (housing finance authority is a corporate body that has a "distinct legal existence separate from the State and not constituting a department of State government"); RSA 35-A:4, I (Supp. 1983)

(municipal bond bank does not constitute a "department or agency of the State government").

RSA chapter 100-A, however, does not expressly state whether or not the System is an entity that is independent from the executive branch. Nor does it expressly provide for or prohibit Governor and Council review of the System's contracts and investments.

██ ██    We construe an ambiguous statute by examining the legislative intent and the statute's objective. *Hurley v. Public Service Co. of N.H.*, 123 N.H. 750, 754, 465 A.2d 1217, 1220 (1983). Additionally, the construction of a statute by those charged with its administration is entitled to substantial deference. *Hamby v. Adams*, 117 N.H. 606, 609, 376 A.2d 519, 521 (1977); *Upson v. Board of Trustees*, 124 N.H. 787, 474 A.2d 582 (1984); *United States v. Rutherford*, 442 U.S. 544, 553 (1979); *Clark v. Helms*, 576 F. Supp. 1095, 1100 (D.N.H. 1983). An administrative interpretation may be persuasive. *N.H. Dept. of Rev. Administration v. Public Emp. Lab. Rel. Bd.*, 117 N.H. 976, 977–78, 380 A.2d 1085, 1086 (1977).

██    Three factors convince us that the legislature intended the System to be an independent entity rather than an executive department or agency: first, the language of RSA chapter 100-A, establishing the System as an incorporated pension trust under the "full power" of its board of trustees; second, the fiduciary obligation that the trustees owe the System's members and beneficiaries; and third, the long-standing practice by the System of autonomy in its contractual dealings, which establishes an administrative gloss on the statute.

██    First, the language of RSA chapter 100-A suggests that the legislature intended the board of trustees to administer the System independently and without oversight by the Governor and Council. RSA 100-A:2 invests the System with "the powers, privileges and immunities of a corporation." RSA 100-A:14 (1977 and Supp. 1983) gives the board of trustees significant latitude in the administration of the System by authorizing the board to hire employees, engage outside services and promulgate rules. Similarly, RSA 100-A:15 (1977 and Supp. 1983) gives the board "full power" over the System's investments, "full power" to purchase and transfer securities and investments and "full power and authority" to delegate its decision-making power over investments. We have previously given a broad interpretation to the term "full power and authority" in other contexts. *See N.H.-Vt. Physician Serv. v. Durkin*, 113 N.H. 717, 721, 313 A.2d 416, 419–20 (1973); *Opinion of the Justices*, 113

N.H. 149, 152, 304 A.2d 86, 87 (1973); *State v. Almy*, 67 N.H. 274, 279, 28 A. 372, 374–75 (1892). We find that the language of RSA chapter 100-A supports the conclusion that the legislature intended the board to have the power to administer the System independently of the executive branch. *Cf.* RSA 10:1 (Supp. 1983).

■ Second, the System's independence is further underscored by its status as a trust. *See* RSA 100-A:2 (System's property shall be "held in trust for the purpose for which received"). Under the common law of trusts, the board of trustees owes the System's members and beneficiaries a fiduciary obligation to manage the System for the benefit of its members and beneficiaries. *See* RESTATEMENT (SECOND) OF TRUSTS § 2 (1959) (a trust is a fiduciary relationship with respect to trust property). In contrast to the duty owed by the board narrowly to the trust beneficiaries, the Governor and Council have a responsibility to a far broader constituency. Review by the Governor and Council of the System's personal service contracts would carry with it the potential for affecting the board's duty to the trust beneficiaries. *See Hansen v. Utah State Retirement Bd.*, 652 P.2d 1332, 1338 (Utah 1982) (fiduciary responsibilities of Utah's retirement board would conflict with control by State auditor). We therefore conclude that the legislature did not intend such review by the Governor and Council.

■ Third, turning to the administrative interpretation of RSA chapter 100-A, we note that, when the meaning of a statute is in doubt, "the long-standing practical and plausible interpretation applied by the agency responsible for its implementation, without any interference by the legislature, is evidence that the administrative construction conforms to the legislative intent." *Hamby v. Adams*, 117 N.H. 606, 609, 376 A.2d 519, 521 (1977); *see* 2A C. SANDS, STATUTES AND STATUTORY CONSTRUCTION § 49.09, at 400-01 (4th ed. rev. 1984) (administrative interpretation of statute is presumed correct following legislative reenactment); *United States v. Rutherford*, 442 U.S. 544, 554 (1979) ("we are reluctant to disturb a longstanding administrative policy that comports with" the language, history and purpose of a statute).

■ A long-standing administrative interpretation of a statute is irrelevant, however, if such interpretation is "'in clear conflict with the express statutory language.'" *Upson v. Board of Trustees*, 124 N.H. 787, 790, 474 A.2d 582, 584 (1984) (quoting *Hamby v. Adams*, *supra* at 609, 376 A.2d at 521 (1977)). Here, we turn to the administrative, practical interpretation of RSA chapter 100-A precisely because the statute lacks express language regarding the issue

before us. We therefore apply the "practical interpretation" rule enunciated in *Hamby* rather than the exception applied in *Upson*.

█ In the instant case, the System has never submitted personal service contracts for review by the Governor and Council since the enactment of RSA chapter 100-A in 1967. This practice represents a very long-standing administrative interpretation of the System's independence and of the powers and obligations of the board of trustees under RSA chapter 100-A. The legislature has not interfered with this interpretation. We conclude that, under the "practical interpretation" rule in *Hamby*, the administrative interpretation conforms to a legislative intent to grant the System the type of autonomy that precludes review by the Governor and Council.

We hold that the System is not an agency or department within the executive branch. Consequently, the Governor and Council lack a basis for reviewing the System's personal service contracts and, therefore, may not do so.

We remand to the superior court with instructions to issue an order consistent with this opinion.

*Remanded.*

All concurred.