Hillsborough
No. 87-299

CATHOLIC MEDICAL CENTER and PORTSMOUTH HOSPITAL

v.

ELLIOT HOSPITAL

May 6, 1988

*Craig & Wenners P.A.*, of Manchester (*Vincent A. Wenners, Jr.*, and *Gary L. Casinghino* on the brief, and *Mr. Wenners* orally), for the plaintiffs.

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*William J. Donovan* and *Jon S. Richardson* on the brief, and *Mr. Donovan* orally), for the defendant.

JOHNSON, J. The defendant, Elliot Hospital (Elliot), filed this interlocutory appeal of a ruling by the Superior Court (*McHugh, J.*). The court concluded that Elliot had violated RSA 151-C:4, I, by offering, on an outpatient basis, left heart catheterization (LHC) services without first obtaining a certificate of need (CON) from the health services planning and review board (the board). Elliot contests the portion of the trial court's decree which concluded that RSA chapter 151-C requires the providers of all new institutional health services, whether offered on an inpatient or an outpatient basis, to secure CON's prior to furnishing the new services. We conclude that RSA chapter 151-C does not require Elliot to obtain a CON in order to continue performing LHC procedures on an

outpatient basis, and we therefore reverse the decision of the trial court and remand.

The action from which this appeal arises commenced in July, 1985, when the plaintiff Catholic Medical Center (CMC) filed a complaint with the board which asserted that Elliot was acquiring equipment with which to perform LHC's without having first filed an application for a CON. Elliot responded that pursuant to a proposed order prepared by CMC and Elliot, and affirmed by this court in 1982, and to the equipment replacement provisions of RSA chapter 151-C, it possessed a legal right to purchase the equipment necessary to perform LHC's. *See* RSA 151-C:5, II(a) and (d). On November 22, 1985, the board ruled that Elliot was correct in its interpretation of the applicable statutes and, therefore, that Elliot did not need an additional CON in order to acquire the catheterization equipment.

In October, 1986, counsel for CMC learned that an LHC had been performed, at the Elliot Hospital, on a 54-year-old woman. CMC petitioned the board for injunctive relief to prevent Elliot from offering LHC services. Elliot responded to the board that its LHC program was exempt from the CON requirement of RSA chapter 151-C because it was offered exclusively on an outpatient basis. At an October 31 hearing concerning CMC's petition, the board affirmed its prior decision that Elliot, in offering outpatient LHC services without having first obtained a CON, was not violating RSA chapter 151-C. The board also declined to act on CMC's request that the board urge the office of the attorney general to seek injunctive relief against Elliot pursuant to RSA 151-C:14, I(d). In declining to so act, the board left it to the parties to litigate their dispute.

In December, 1986, CMC and Portsmouth Hospital (Portsmouth) jointly petitioned the court to enjoin Elliot from performing outpatient LHC procedures without benefit of a CON. Elliot responded by filing its own petition, which requested the court to enjoin CMC's alleged performance of unauthorized institutional health services; namely, open heart surgery and angioplasty. The court advised the parties to agree to present their dispute, in the first instance, to the board, as RSA chapter 151-C contemplates. *See* RSA 151-C:9, :10. Since the parties were unable to agree on that course of action, the court decided to hear their dispute. The court found Elliot in violation of the CON requirement contained in RSA 151-C:4, I. However, it declined to grant CMC's and Portsmouth's request for injunctive relief pending the board's review of and ruling on Elliot's request for standards concerning

the performance of LHC procedures. This interlocutory appeal by Elliot followed.

The issue which this case presents is whether the trial court erred in ruling that RSA chapter 151-C requires Elliot to obtain a CON prior to offering LHC services, even if Elliot offers those services on an outpatient basis only and does not exceed the one-million dollar construction or the four-hundred-thousand dollar equipment acquisition limitations of RSA 151-C:5, II in order to make the service available.

CMC and Portsmouth argue, preliminarily, that Elliot failed to raise in a timely fashion at trial the claim which it now makes that the board interpreted RSA chapter 151-C to exempt outpatient services from the CON requirement. We disagree. Elliot's trial brief specifically argued that "the State Board ha[s] recognized that outpatient services are exempt from 151-C . . . ." In support of this argument, the trial brief refers to a letter from the board to Ms. Martha Marsh, Vice President of Elliot Hospital, dated May 8, 1986. That letter stated that the board approved the hospital's decision to replace its existing catheterization equipment, but did not approve of the hospital's performing *new inpatient* services, including LHC's, governed by RSA 151-C:5, II(c). These references in Elliot's trial brief are sufficient to have raised at trial the issue of whether or not the board interpreted RSA chapter 151-C to exempt outpatient procedures from the CON requirement.

RSA 151-C:4, I, requires that a CON be obtained prior to the offering of new institutional health service. The trial court concluded that the performance of LHC's at the Elliot Hospital was the offering of a "new institutional health service," within the meaning of RSA chapter 151-C, because, prior to October, 1986, LHC's were performed only sporadically or as a result of emergency treatment, not as a part of a regular program of service. As a "new institutional health service," the court determined, an LHC cannot be performed at Elliot's facility on either an inpatient or an outpatient basis unless and until Elliot obtains a CON from the board.

Elliot bases its claim of error, in part, upon the ground that LHC's are not a "new institutional health service," as they have been performed at Elliot's facility since the late 1970's. Dr. Gerald Angoff, a cardiologist on the staffs of both Elliot and CMC, testified at trial that Elliot has maintained a catheterization laboratory adjacent to its intensive care unit since at least 1978, when he began practicing medicine in Manchester.

In 1982, Elliot sought and obtained from the board a CON in order to be able to acquire, as part of its major renovation program, upgraded catheterization laboratory equipment which would give Elliot the same capacity to perform catheterizations as existed at CMC. Indeed, this Court in 1982 affirmed an order which issued the CON to Elliot. That CON does not limit Elliot regarding the improvement of its catheterization laboratory, nor does it prevent Elliot from developing a laboratory which is substantially identical to that which exists at CMC.

Dr. Michael J. Hearne of Manchester, an invasive cardiologist on the staffs of both Elliot and CMC, testified that he moved to Manchester in 1985 because he was recruited by a potential partner specifically to perform invasive cardiovascular procedures and that he was informed by his prospective partner that catheterization laboratories would be available to him at both Elliot and CMC.

Dr. John Beatty Hunter, also a Manchester cardiologist, testified that prior to October, 1986, Elliot's capacity to perform LHC's was limited because its facility lacked state-of-the-art equipment. For example, cine coronary angiography was not possible; hence, an LHC could not be performed on a patient over the age of thirty-five. Nonetheless, Dr. Hunter acknowledged that there exist some problems associated with heart disease for which a diagnosis is achieved by the insertion of a catheter into a major pumping chamber of the left ventricle and by the subsequent evaluation of a sophisticated set of pressure measurements, which reveals whether the heart valves have narrowed or are leaking. This procedure qualifies as an LHC, and the catheterization laboratory at Elliot Hospital was equipped to perform it prior to October, 1986.

The issuance of the 1982 CON and the undisputed testimony of Drs. Angoff, Hearne and Hunter indicate that the LHC services which Elliot performed after October, 1986, were improved, but not new, institutional health services. Therefore, the conclusion of the trial court that LHC was a new institutional health service within the meaning of RSA 151-C:4, I, was erroneous. Since LHC was not a new institutional health service at Elliot in 1986, a CON was not required before that service could be performed.

Elliot also claims that the court erred in concluding that the term "institutional health service," as defined in RSA 151-C:2, XXII, is not limited to inpatient services, but instead includes ambulatory surgical facilities and home health care, which clearly qualify as outpatient services. In the trial court's view, Elliot cannot escape

the CON requirement of RSA 151-C:4, I, merely by choosing to offer LHC's only on an outpatient basis.

The court's interpretation of the statute, however, conflicts with the board's interpretation. In a December 4, 1985 letter to Francis J. Cronin, President of Elliot Hospital, Susan Palmer Terry, director of the office of health services planning and review, stated that the board, at its November 22, 1985 meeting, had determined that Elliot was merely replacing existing equipment in its special procedures room and was not acquiring equipment which was substantially different from that which it already possessed. Therefore, Ms. Terry informed Elliot's president, the upgrading by Elliot of its special procedures room did not require the prior issuance of a CON by the board.

In a May 8, 1986 communication to the parties, the board stated:

"The Board finds that the acquisition of the equipment [to perform LHC's] is not subject to [CON] review under the provisions of RSA 151-C:5 II(d) [which mandates CON review whenever a health care provider seeks to purchase, lease, donate or transfer diagnostic or therapeutic equipment which costs or is valued at more than $400,000]. The Board further finds that the acquisition of this equipment is not to be construed as permission to perform new *inpatient* services, such as left heart catheterization, pursuant to RSA 151-C:5 II(c)."

(Emphasis added.)

The minutes of a July 10, 1987 meeting of the board, at which a committee of cardiologists discussed with board members the committee's suggested rule regarding cardiac catheterization and coronary angiography (a rule requested by CMC), reveal that the board and the committee believed that the CON requirement applied only to inpatient services. A committee member stated:

"As far as need goes, this thing [the CON] deals only with inpatient services. Something I should point out very explicitly is that there is a lot of discussion as to whether the state has any authority over outpatient cardiac cath services and it's the consensus of the committee and staff that outpatient services are not covered unless there is a major capital expenditure for equipment. Otherwise, if someone wants to establish an outpatient service and does not meet the equipment threshold, they would not be reviewable."

■■ We agree with the board's interpretation; namely, that RSA chapter 151-C does not require that a CON be obtained prior to the offering of an outpatient service. "[T]he construction of a statute by those charged with its administration is entitled to substantial deference." *Hamby v. Adams*, 117 N.H. 606, 609, 376 A.2d 519, 521 (1977); *N.H. Retirement System v. Sununu*, 126 N.H. 104, 108, 489 A.2d 615, 618 (1985).

RSA 151-C:2, XXII, in its current form, defines institutional health services as "health services provided in or through health care facilities or health maintenance organizations"; it makes no mention of ambulatory surgical facilities or home health care. Moreover, RSA 151-C:2, XXII specifically excludes from its purview institutional health services as referred to in RSA 151-C:4, which articulates the CON requirement for new health services.

RSA 151-C:5, II, which requires the board to develop standards for regulating new institutional health services, requires the development of such standards (which the board implements via CON review) when: (1) a health care facility seeks to undertake a construction or renovation project which entails a capital expenditure of more than one million dollars; (2) a facility seeks to develop and offer "special inpatient services," including but not limited to alcohol and drug dependency treatment, psychiatric services or physical therapy; and (3) a facility seeks to acquire, lease, donate or transfer diagnostic or therapeutic equipment which costs or is valued at over four-hundred-thousand dollars and which is not substantially similar to equipment which the facility has owned in the preceding twelve months.

Elliot did not exceed the dollar limits prescribed by the statute when it sought to improve its catheterization laboratory because its total capital expenditure was eight-hundred ninety-thousand dollars, well under the one million dollar statutory ceiling for capital expenditures, and because the combined cost of the cine camera and processor which it acquired for the laboratory was sixty-thousand dollars, substantially less than the four-hundred-thousand dollar statutory ceiling for equipment acquisitions or transfers. Moreover, the trial court agreed with Elliot that LHC is not a "special inpatient service" because none of the procedures listed under "special inpatient services" in the statute is even remotely similar to LHC.

Nothing in the above statutory language leads one to conclude that the CON requirement of RSA 151-C:4 applies to the outpatient LHC services offered by Elliot. Indeed, the language of the 1985 amendments reflects a legislative recognition that most medical

procedures performed on an outpatient basis are customarily less difficult and less costly to perform than medical procedures which are provided on an inpatient basis only, and that outpatient procedures, therefore, do not warrant the extent of regulation to which inpatient services are subject. Nevertheless, by including specific dollar limits in RSA 151-C:5, II, the legislature insured that outpatient services which are costly, hence deserving of scrutiny in the public interest, will be subject to regulation by means of CON review. The legislature's decision not to regulate outpatient services which do not reach the statutory dollar thresholds was a rational choice to direct regulatory resources toward those procedures which exert the greatest impact upon health care costs.

Similarly, the legislature chose to foster competition in the provision of health care services, as is reflected in the language of RSA 151-C:1, III. That paragraph states: "The state has an interest in promoting and stimulating competition in the health care marketplace as a means of managing the increases in health care costs." We believe that permitting Elliot to perform LHC's on an outpatient basis serves this interest. These services can be offered to more people at lower prices because a hospital stay is unnecessary. Other Manchester area hospitals, in order to remain competitive, will be forced to either reduce their prices for catheterization services or begin performing LHC's on an outpatient basis. Either one of these choices would serve the pro-competitive aim of RSA chapter 151-C.

■ For the reasons cited above, we hold that the trial court erred in ruling that RSA chapter 151-C regulates the Elliot Hospital's outpatient LHC services and requires Elliot to obtain board approval before offering LHC services on an outpatient basis.

*Reversed and remanded.*

All concurred.