Merrimack
No. 2010-205

STATE EMPLOYEES' ASSOCIATION OF NEW HAMPSHIRE, INC.,
SEIU LOCAL 1984

v.

STATE OF NEW HAMPSHIRE

Argued: November 17, 2010
Opinion Issued: February 25, 2011

*Molan, Milner & Krupski, PLLC*, of Concord (*Glenn R. Milner* on the memorandum of law and orally), for the petitioner.

*Michael A. Delaney*, attorney general (*Anne M. Edwards*, associate attorney general, on the brief and orally)¸ for respondent State of New Hampshire.

*Hinckley, Allen & Snyder LLP*, of Concord (*Christopher H. M. Carter* and *Suzan M. Lehmann* on the brief), for the Community College System of New Hampshire, as *amicus curiae*.

CONBOY, J. The respondent, the State of New Hampshire, appeals a ruling of the Superior Court (*Sullivan*, J.) in favor of the petitioner, State Employees' Association of New Hampshire, Inc., SEIU Local 1984: (1) granting the petitioner's request for a writ of mandamus; (2) denying the respondent's motion to dismiss; and (3) granting the petitioner's request for declaratory judgment. We reverse.

The facts in this case are not disputed. Prior to 2007, New Hampshire's community colleges comprised the Department of Regional Community Technical Colleges (DRCTC). This department was governed by RSA chapter 188-F, which stated, "[T]he department shall be a state agency." RSA 188-F:2 (1999) (repealed 2007). The department was headed by a

commissioner appointed by the Governor and approved by the Executive Council. RSA 188-F:5, I (1999) (repealed 2007).

In 2007, the legislature enacted Senate Bill 82, which eliminated DRCTC and created the Community College System of New Hampshire (CCSNH) as a body politic and corporate with limited legislative oversight. See Laws 2007, ch. 361. The legislature mandated numerous changes, effective July 17, 2007, see RSA 188-F:1 (Supp. 2010), including the delegation of "broad authority" to a board of trustees to be the "policy-making and operational authority" of CCSNH. See RSA 188-F:2, II (2008); RSA 188-F:3, II (Supp. 2010). The trustees are entrusted with "the management and control of all the property and affairs of the community college system." RSA 188-F:6 (Supp. 2010). They have the power to enter into contracts without the approval of the Governor and Council, which is required for state agency contracts. See RSA 188-F:6, XI (Supp. 2010); RSA 4:15 (2003); N.H. Retirement System v. Sununu, 126 N.H. 104 (1985). The legislature repealed references to DRCTC employees in the state compensation statutes, see RSA 94:1-a (2001). It also mandated changes that would deprive CCSNH of state benefits and services, such as defense and indemnification, the use of financial and administrative services, and the advice of the attorney general, to be effective in July 2009. Laws 2007, 361:35, :40. That effective date was subsequently extended to 2011. Laws 2009, 148:1. Pending termination of these services, CCSNH will be required, unlike state agencies, to pay the state for financial and administrative services. Laws 2009, 143:17.

In 2009, in response to budget cuts, the legislature passed House Bill 2, which requires all state departments or establishments, as defined by RSA 9:1 (2003), to fill vacant positions by first making offers to laid-off state employees who meet the minimum qualifications for the position. Laws 2009, ch. 144. RSA 9:1 states that "the term 'department' or 'establishment' means any executive department, commission, board, institution, bureau, office, or other agency of the state government, by whatever name called, other than the legislature and the state judicial branch, that uses, expends or receives any state funds . . . ." The petitioner represents three laid-off state employees who applied for jobs within CCSNH. Each met the minimum position qualifications, but CCSNH did not accord them the rehiring preference mandated by House Bill 2.

In its petition for a writ of mandamus, the petitioner requested an order from the trial court requiring CCSNH to abide by the terms of House Bill 2. The trial court found that CCSNH met the definition of a department or establishment under RSA 9:1 and, thus, was governed by House Bill 2. On appeal, the State argues that CCSNH is neither, but rather is a "body politic and corporate."

The facts in this case are undisputed, and the only question is the correct interpretation of a statute. As the interpretation of a statute is a question of law, we review the trial court's decision *de novo*. *Kenison v. Dubois*, 152 N.H. 448, 451 (2005). We are the final arbiter of the intent of the legislature as expressed in the words of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. *Id.* When the language of a statute is clear on its face, its meaning is not subject to modification. *Dalton Hydro v. Town of Dalton*, 153 N.H. 75, 78 (2005). We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent. *Appeal of Parkland Med. Ctr.*, 158 N.H. 67, 72 (2008). When statutory language is ambiguous, however, we will consider legislative history and examine the statute's overall objective. *Favazza v. Braley*, 160 N.H. 349, 351 (2010). We interpret a statute in the context of the overall statutory scheme and not in isolation. *State v. Lamy*, 158 N.H. 511, 515 (2009).

In ruling that CCSNH falls within RSA 9:1's definition of department or establishment, the trial court found that CCSNH receives 36% of its funds from state appropriations and meets the definition in BLACK'S LAW DICTIONARY of an "institution": "an establishment, especially one of eleemosynary or public character or one affecting a community . . . . It may be private in its character, designed for profit to those composing the organization, or public and charitable in its purposes, or educational (*e.g.*, college or university)." BLACK'S LAW DICTIONARY 800 (6th ed. 1990). Consequently, the trial court concluded, "there is no doubt that CCSNH is an institution that receives state funds[] and appears to fall within the plain meaning of RSA 9:1."

The trial court also relied upon the language of RSA 188-F:7, III (2008) to support its conclusion. RSA 188-F:7, III provides that CCSNH employees who transfer to other state positions shall retain and transfer all leave accruals and seniority, and "service as an employee of the community college system of New Hampshire shall be creditable service for purposes of" retirement, life insurance, and medical benefits provided to state employees. The trial court stated: "Because the legislature has clearly intended that CCSNH employees be given equal benefits as other state employees, . . . CCSNH falls within the definition of RSA 9:1, therefore making it subject to the rehiring provision of [House Bill] 2."

We begin our analysis with the language of RSA 9:1, which defines the terms "department" or "establishment" as "any executive department, commission, board, institution, bureau, office, or other agency of the state government, by whatever name called, other than the legislature and the state judicial branch, that uses, expends or receives any state funds . . . ."

The State argues that "executive" modifies each word of the phrase "department, commission, board, institution, bureau, office, or other agency of the state government," such that each entity must be part of the executive branch of government. The State also asserts that inclusion of the phrase "other than the legislature and the state judicial branch" supports its interpretation. In contrast, the petitioner argues that the trial court correctly ruled that "executive" modifies only the word "department." The petitioner asserts that the State's interpretation fails because RSA 9:1 expressly excludes from coverage the legislature and the state judicial branch, an exclusion rendered superfluous if the State's argument is correct. In light of these two reasonable interpretations, we find that the statute is ambiguous and, therefore, turn to legislative history and related statutes for indications of legislative intent. *See Favazza*, 160 N.H. at 351.

RSA chapter 9, entitled "Budget and Appropriations," details the process by which the Governor submits the state's budget to the legislature. "Departments" or "establishments," as defined by RSA 9:1, must submit expected requirements for their operating budgets and capital expenditures in a detailed format, identifying requirements for administration, operation, maintenance expenditures, costs for workers' compensation and unemployment compensation, and costs for land, construction, furnishings and equipment. *See* RSA 9:3-a (2003); RSA 9:4 (2003).

Prior to 1979, RSA 9:1 read, in pertinent part: "[T]he term 'department' or 'establishment' means any executive or *judicial* department, commission, board, institution, bureau, office, *court*, or other agency of the state government, by whatever name called, *other than the legislature*, that uses, expends or receives any state funds." RSA 9:1 (1955) (emphasis added). When the statute was changed to its current form in 1979, Representative John Tucker, speaking for the Appropriations Committee, explained to the House: "This bill eliminates the requirement that the judicial branch submit its budget to the governor." N.H.H.R. JOUR. 621 (1979). Thus, it was understood that prior to 1979, the word "judicial" modified all of the terms in the list that followed; it would therefore be illogical to conclude that the word "executive" modified only the first term in the list. It is logical to conclude that by excluding, in addition to the legislature, all judicial branch entities, including courts, from the definition of "department" or "establishment," the legislature left within the definition all executive branch entities.

■ Receipt of state funds is not dispositive of the issue of whether an entity is a state agency within the meaning of RSA 9:1. The State maintains, and the petitioner does not dispute, that the University System of New Hampshire (USNH), a body corporate and politic, is an institution

that receives state funds, but does not follow the budgetary process governing RSA 9:1 entities. The legislature "does not have approval power over the entire operating budget of USNH, nor does it approve the line item budget." *University System of New Hampshire v. United States Gypsum*, 756 F. Supp. 640, 646 (D. N.H. 1991); Laws 2009, ch. 143 (showing state appropriations for USNH for fiscal year 2010-2011). The petitioner also does not dispute that the Community Development Finance Authority and the Business Finance Authority are bodies corporate and politic created by the State, and that neither is considered a department or establishment under RSA 9:1. *See* RSA 162-A:4 (2002); RSA 162-L:2 (2002).

■ We conclude that the modifier "executive" was intended to modify each listed entity: "department, commission, board, institution, bureau, office, or other agency of the state government." Therefore, we agree with the State that the more reasonable interpretation of the current law is that the "legislature intended RSA 9:1 to apply only to state agencies and other entities within the State's executive branch." The trial court erred in ruling that RSA 9:1 applies to all institutions that receive state funds.

■ We turn now to the question of whether the legislature intended CCSNH to be an executive branch entity. In doing so, we note that "the concept of a legislatively created entity independent of the executive branch is not at all novel." *N.H. Retirement System*, 126 N.H. at 107. In *N.H. Retirement System*, three factors led us to conclude that "the legislature intended the [New Hampshire Retirement] System to be an independent entity rather than an executive department or agency." *Id.* at 108. These were: (1) the language of RSA chapter 100-A, which established the System; (2) the fiduciary obligation owed by its trustees to its beneficiaries; and (3) the administrative gloss on the statute established by the System's history of functioning independently. Here, the second factor is inapplicable, and the petitioner disputes whether the respondent properly preserved the administrative gloss argument below. However, the language of RSA chapter 188-F and its legislative history provide ample evidence of the legislature's intent that CCSNH not be part of the executive branch, that CCSNH not be subject to the budget procedure set out in RSA chapter 9, and that CCSNH employees not be employees of the State.

RSA 188-F:25 (2008) governs the police standards and training council, which was previously under the administration of the DRCTC. *See* RSA 188-F:25 (1999) (repealed 2007) ("The police standards and training council is transferred to the department of regional community-technical colleges and is administratively attached to that department."). When the legislature created CCSNH in 2007, however, it retained the police standards and training council as part of the executive branch. *See* N.H.S. JOUR. 536

(2007) (comments of Sen. Janeway). Accordingly, it specifically distinguished the council's position as an executive branch agency from CCSNH's new status as a body corporate and politic: "The police standards and training council is an executive branch council and is not a body corporate and politic." RSA 188-F:25 (2008).

The New Hampshire Senate Journal provides further evidence of the legislature's intent regarding the changes to RSA chapter 188-F. The following exchange took place on the floor of the Senate on the subject of the level of oversight that the legislature would have over CCSNH's budget process:

> Senator Gatsas: Senator, does this mean that the New Hampshire Technical Colleges will now be like the University System where we as a state don't have the ability to look at line items in their budget?

> Senator D'Allesandro: When — thank you for the question, Senator Gatsas. When this transition is complete, they will mirror the functioning of the University System. That's correct.

N.H.S. Jour. 537 (2007).

■■ Additional amendments to RSA chapter 188-F were made in 2010 to continue "the effort . . . to make the New Hampshire community college system autonomous." N.H.H.R. Jour. (May 5, 2010) (comments of Rep. Bergin, speaking for the Finance Committee). "This bill . . . changes the format in which CCS[NH]'s budget is presented, and includes clarifying language that the CCS[NH] employees are not subject to the personnel provisions of the department of administrative services." N.H.H.R. Jour. (April 14, 2010) (comments of Rep. Stiles, speaking for the Education Committee). The trustees of CCSNH are authorized to "submit [CCSNH's operating] budget in accordance with RSA 9:4-e and at the same time as state agencies." RSA 188-F:6, VI (Supp. 2010). This subsequent history confirms both the legislature's intent that CCSNH participate in a budgetary process separate from that of RSA 9:1 agencies and its understanding that CCSNH is not a state agency. See Franklin v. Town of Newport, 151 N.H. 508, 512 (2004) (holding that subsequent legislative history, while not controlling, may be considered). Further, CCSNH has been given the authority to "[d]evelop and adopt personnel policies and procedures" for its employees, as well as to determine the compensation of its employees. RSA 188-F:6, XVI (Supp. 2010). As of 2010, its employees are not considered classified employees of the state and are not subject to the rules promulgated by the New Hampshire Department of Personnel. RSA 21-I:49, X (Supp. 2010).

■ We disagree with the trial court's conclusion that RSA chapter 188-F, which addresses the benefits and retirement system participation of CCSNH employees, demonstrates that the "legislature has clearly intended that CCSNH be given equal benefits as other state employees." Rather, RSA 188-F:7 was intended to protect those employees who had been state employees from the loss of expected benefits. The 2007 amendments provided that full-time employees of the community college system, as of the effective date of the amendments, are members of the New Hampshire Retirement System. *See* RSA 188-F:7 (Supp. 2010); RSA 100-A:1, V (Supp. 2010); RSA 100-A:3, I (Supp. 2010). Accordingly, the definition of "employer" in RSA 100-A:1, IV was expanded to include "the community college system of New Hampshire." The legislature also provided that CCSNH employees would be able to transfer accumulated benefits and seniority to state positions. If CCSNH were to remain a state agency, these statutory changes would not have been necessary, as CCSNH employees would unquestionably be eligible for state employee benefits.

The Senate Journal demonstrates that the concern of legislators was to ensure that DRCTC employees would not lose benefits and seniority accumulated in state service. *See* N.H.S. JOUR. 539 (2007) (comments of Sen. Gatsas) ("I've gotten some calls from employees of the New Hampshire Technical Colleges and their concern is, is that the Retirement System at the state level gives them health insurance benefits for the rest of their lives. They're not clear, the ones that are close to retirement, that once they're transitioned out, if the Retirement System that they are put into gives them the same benefit, and that's a concern.").

The practice of providing non-state employees with state employee benefits is not unique. Employees of the Land and Community Heritage Investment Program are not state employees, *see* RSA 227-M:6-a, I (Supp. 2010), but are permitted "to elect to receive such health, dental, life insurance, deferred compensation, and retirement benefits as are afforded to classified employees of the state." RSA 227-M:6-a, II (Supp. 2010). Similarly, employees of the Community Development Finance Authority are not state employees. RSA 162-L:19 (Supp. 2009). However, when the legislature transferred certain executive branch employees to the Authority, it permitted them "to continue to receive such health, dental, life insurance, deferred compensation, and retirement benefits as are afforded to classified employees of the state." *Id.*

In addition to legislative history, we also examine the statute's overall objective in order to resolve any ambiguity in the statute. *Favazza*, 160 N.H. at 351. The legislature recognized that legislative oversight must be balanced with academic freedom: "The general court also recognizes the need to protect the institutions of the community college system of New

Hampshire from inappropriate external influence which might threaten the academic freedom of faculty members or otherwise inhibit the pursuit of academic excellence." RSA 188-F:3, II (2008). Accordingly, "the general court . . . delegated broad authority to the board of trustees who shall be responsible for managing the community college system of New Hampshire in a manner which promotes academic excellence and serves the educational needs of the people of New Hampshire." *Id.* A mandated hiring preference rule would infringe upon the academic freedom the legislature meant to confer upon CCSNH.

■ Accordingly, we hold that CCSNH is not a department or establishment as defined by RSA 9:1 and, therefore, is not subject to the provisions of House Bill 2.

*Reversed.*

DALIANIS, C.J., and DUGGAN and HICKS, JJ., concurred.