Health Services Planning and Review Board
No. 88-225

## APPEAL OF REHABILITATION ASSOCIATES OF NEW ENGLAND
### (New Hampshire Health Services Planning and Review Board)

April 7, 1989

*Nixon, Hall & Hess*, of Manchester (*Francis G. Murphy, Jr.*, on the brief and orally), for Rehabilitation Associates of New England.

*Stephen E. Merrill*, attorney general (*Martha Pyle Farrell*, attorney, on the brief), by brief for the State, as *amicus curiae*.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Eugene M. Van Loan, III*, on the brief), by brief for Capital Region Health Care Corporation, as *amicus curiae*.

*Craig & Wenners*, of Manchester and *Choate, Hall & Stewart*, of Boston, Massachusetts (*William H. Craig & a.* on the brief, and *Paul W. Allison* orally), for St. Joseph Hospital, Cheshire Medical Center and Catholic Medical Center.

JOHNSON, J. In this appeal from a decision and a denial of a motion for reconsideration by the New Hampshire Health Services Planning and Review Board (the board), the plaintiff, Rehabilitation Associates of New England (RANE), raises the following issues: (1) whether RANE, as a holder of a certificate of need, may re-site its planned facility within the same service area without first obtaining board approval; and (2) whether the board abused its discretion in failing to grant RANE a six-month extension of the time period in which RANE had to commence construction of the facility. We hold that RANE's re-siting of the facility from a site in Allenstown to the grounds of the Concord Hospital in Concord did not require prior board approval. Because we find that RANE had commenced construction of the facility by the statutorily required date, we do not reach the second issue.

In September 1984, RANE, a New Hampshire limited partnership, filed an application for a certificate of need (CON) with the New Hampshire Certificate of Need Review Board (the board), the predecessor of the New Hampshire Health Services Planning and Review Board, for a 100-bed comprehensive acute physical rehabilitation facility which would include the treatment of head injuries. Although the application stated that the facility was to be situated in the Concord region, it did not specify a particular site. During the review process which followed filing, RANE indicated that it had an option to purchase land in Allenstown and planned to build its facility there.

The board initially denied the CON. However, following a hearing on a motion for reconsideration, the board granted RANE a CON to build its facility at a cost of $15,500,000. Following an appeal by other health care providers who claimed that they had not been provided with adequate notice of the reconsideration hearing, we affirmed the board's decision. *Appeal of Catholic Medical Center,* 128 N.H. 410, 515 A.2d 1205 (1986). Because RANE was unable to commence construction of its facility pending final decision by this court, the board ruled that RANE had eighteen months from October 6, 1986, the date that this court had denied a motion for reconsideration, to commence construction of its facility. *See* RSA 151-C:12, I(b)(2) (Supp. 1988). Construction thus had to begin by April 6, 1988.

In March 1987, RANE indicated to the board that it preferred to build the facility on the grounds of the Concord Hospital in Concord, rather than on the Allenstown site, some seven miles away. At a meeting of the board held on May 22, 1987, RANE informed the board that it had signed a letter of intent with the Concord Hospital and requested permission to move the facility to that site. RANE emphasized that it had no intention of changing the scope of the project or the type of services offered, or increasing the cost of development. RANE was told that its request for approval of the site change was premature. The board chairman instructed RANE to conclude its negotiations with Concord Hospital and then show the board a final "package"; at that point the board would determine whether the change constituted a "change in scope" and, if it did, whether the board would allow it. RANE submitted a detailed packet of information on March 4, 1988, which included a request for a six-month extension of the period during which it had to commence construction of its facility, as well as a discussion of the merits of locating the rehabilitation facility on the grounds of the Concord Hospital.

On March 23, 1988, RANE moved for a hearing in which to demonstrate that it had the necessary "good cause" to support its request for a six-month extension. In the memorandum of law which it submitted to support the motion, RANE contended that protracted negotiations with the Concord Hospital, which it asserted culminated in an "unprecedented" relationship of great benefit to the public, entitled RANE to such an extension. RANE also renewed its request for a ruling that the change in the site of RANE's rehabilitation facility would not constitute a change in the "scope" or "location" of the facility. Following a hearing held on March 25, the board denied RANE's request for the six-month

extension. It did not rule on the question of whether RANE's proposed site change would constitute a change in scope. The board chairman informed RANE that the "CON is good to build in Allenstown until the 6th of April." Implicit in this ruling, and the May 22, 1987 ruling, was the assumption that RANE could build on the Concord site only if the board had previously ruled either that such a site change did not constitute a change in scope or, if it did, that such a change was permissible.

On April 4, 1988, two days before the commencement period would expire, RANE began construction at the site in Concord. It then filed a motion for reconsideration with the board, to which it attached (1) a ground lease agreement between RANE and Capital Region Health Care Corporation, the parent corporation of Concord Hospital; (2) a contract between RANE and Commercial Construction, Inc. for the building of the Concord facility; (3) certification by the president of the corporate general partner of RANE that the document was a true and correct copy of the construction contract; and (4) a copy of a check payable to the order of Commercial Construction, Inc. in the amount of $18,370 for payment of the construction which had taken place. On April 7, 1988, RANE voluntarily suspended construction of its facility. On May 20, 1988, the board denied the motion for reconsideration. This appeal followed. The State, as *amicus curiae*, and St. Joseph Hospital & a. have filed briefs in support of the board's decision. Capital Region Health Care Corporation filed a brief as *amicus curiae* in support of RANE's appeal.

The first question we address is whether RANE could re-site the facility approved by the CON under RSA chapter 151-C (Supp. 1988), which governs the granting of CONS, without first obtaining board approval. If the answer to that question is in the affirmative, we will consider whether RANE's activities constituted commencement in accordance with RSA 151-C:12, I(b)(2) (Supp. 1988).

RSA chapter 151-C (Supp. 1988) allows the State, through the board, to control the development of new institutional health services in this State in accordance with standards relative to the affordability and quality of such services. One of the policies underlying the statute is to promote the "rational allocation of health care resources in the state." RSA 151-C:1, I (Supp. 1988). Under the statutory scheme, a new facility cannot be built, or a new service at an existing facility offered, without the provider's first obtaining a CON from the board. RSA 151-C:14 (Supp. 1988). When the board determines that there is a need for additional health services, it must issue a request for applications for the

service. RSA 151-C:8, I (Supp. 1988). What information must be included in the application is determined by rules issued by the board. RSA 151-C:8, IV (Supp. 1988).

According to New Hampshire Administrative Rules He-Hea 301.04 and He-Hea 302.01, every application must contain, *inter alia*, a description of the project, its cost, and its relationship to the existing State health care system and to the applicant's long term goals. N.H. ADMIN. RULES, He-Hea 301.04(a), (h), (n), (o); He-Hea 302.01(a). The rules do not expressly require the applicant to name a proposed site when a new facility is to be constructed. However, when a new service is to be offered in an existing facility, the application must discuss the integration of the project into the named existing facility. N.H. ADMIN. RULES, He-Hea 302.01. RANE's application, which did not name a specific site, was deemed complete by the board, meaning that clarification of the information provided was not necessary in order for the board to complete its review. *See* N.H. ADMIN. RULES, He-Hea 301.06. During the review process, however, RANE did indicate that it planned to site the facility in Allenstown; and the CON, while not conditioning approval of the rehabilitation facility on its construction in Allenstown, referred to the project as a hospital "to be located in Allenstown." We therefore inquire whether the CON was valid only for a rehabilitation facility to be built in Allenstown.

Although the statute gives the board the power to determine by rule what information must be included in the application, *see* RSA 151-C:8, IV (Supp. 1988), the statute itself prescribes when providers must inform the board of certain changes after application. RSA 151-C:8, XII(b) (Supp. 1988) requires an applicant to file an amendment to the application, unless waived by the board, when "any supporting documentation or other material submitted to the board by the applicant indicates" that the estimated capital expenditure has increased by 15% plus the inflation factor, the identity of the applicant has changed, or the "*nature, scope* or *location* of the project will differ substantially from those described in the application." (Emphasis added.) When an applicant files an amendment, the review process starts again. RSA 151-C:8, XII(c) (Supp. 1988). Because a CON is valid only for the "designated scope" of the project, a change in the "scope" must require board approval. *See* RSA 151-C:12, IV (Supp. 1988). Given this statutory framework, and the fact that the board does not claim that material submitted to it indicates that the project's capital expenditure has increased to the necessary extent or that the identity of the applicant has changed, the question as to whether RANE's site

change required prior approval of the board, therefore, turns on whether the resituation could be said to have caused the "nature," "scope" or "location" of the project to differ substantially from that described in the application.

It is a basic precept of statutory construction that the definition of a term in a statute controls its meaning. *Piper v. Railroad*, 75 N.H. 435, 442, 75 A. 1041, 1046 (1910). RSA 151-C: 2, XXIII-a (Supp. 1988) states that "'[l]ocation' means service area." The statute thus defines the term "location" as the service area. No party argues that RANE's re-siting of the facility from Allenstown to Concord moved the facility outside the Concord region service area. Thus, although RANE changed the site of the facility, it did not change its "location" under the statute.

Neither "nature" nor "scope" is defined in RSA chapter 151-C, and we therefore give the words their plain and ordinary meaning. *See Leavitt v. Hamelin*, 126 N.H. 670, 671, 495 A.2d 1286, 1287 (1985). The ordinary meaning of "nature" in the context of the "nature . . . of the project" is "essential character." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1507 (unabridged ed. 1961). The term "scope," as in "scope . . . of the project," denotes the "general range or extent of . . . activity." *Id.* at 2035. In the instant case, the "nature" of the project thus refers to its character as a comprehensive rehabilitation facility, including the treatment of head injuries. The "scope" of the project includes factors such as the number of beds and the total capital expenditure of the project.

The board, however, refused to approve the change in site from Allenstown to Concord without first having an opportunity to review the final plan, because of its belief that such a change could constitute a change in scope. The board was particularly concerned that the change in site might affect various financial variables. Although the administrative interpretation of a statute is entitled to deference, it is not ordinarily controlling. *N.H. Dept. of Rev. Administration v. Public Emp. Lab. Rel. Bd.*, 117 N.H. 976, 977, 380 A.2d 1085, 1086 (1977). With regard to CONS, the board was given the authority by statute to determine what information must be included in an initial application; the statute, however, expressly designated when an applicant who has submitted a completed application or a holder of a CON had to go back to the board for approval. The interpretation of the word "scope" to some extent defines the board's authority. The board's interpretation of the "scope" of the project to include a change in the site without a

change in the service area, or a change in a financial variable without a substantial change in the total expected capital expenditure, does not comport with the ordinary meaning of that term, and serves to expand the board's authority beyond its statutory limits. *See Social Security Board v. Nierotko*, 327 U.S. 358, 369 (1946); *see also Hamby v. Adams*, 117 N.H. 606, 609, 376 A.2d 519, 521 (1977) (even longstanding administrative interpretation of statute not controlling if contrary to express statutory language). We hold that a change in the site of a facility without a change in a factor affecting the "scope" of the project, as defined here, does not require prior board approval. Our decision is not intended to prevent the board from requiring the filing of a "change of scope" in accordance with RSA 151-C:12, IV-a (Supp. 1988), effective June 1988, if any documents or materials submitted to it indicate that the change in site has changed the "location", "nature" or "scope" of the project as those terms must be understood.

█ St. Joseph Hospital *& a.* argue, however, that RSA 151-C:12, IV (Supp. 1988), providing that a "certificate of need shall be valid only for the designated scope of the project and for the premises and geographical area named in the application," requires us to find that RANE could not build the facility in Concord without obtaining prior board approval. They argue that the "premises . . . named in the application" is the Allenstown site. We first note that a CON is required not only for the construction of a new health care facility, but also for the offering of a new service in an existing facility. *See* RSA 151-C:4 (Supp. 1988). It is only in the second situation, where a new service is offered, that an applicant must specify the existing facility where he plans to offer the new service. *See* N.H. ADMIN. RULES, He-Hea 302.01(b). In the first situation, the applicant must specify the service area of the planned facility; he need not, as discussed above, name a specific site. Thus, while the "premises . . . named in the application" can be understood as an existing facility which hopes to offer a new service, there is no "premises . . . named in the application" for the construction of a new facility. An application for new construction names a geographical area, in this case, the Concord region. We therefore understand RSA 151-C:12, IV (Supp. 1988) as disjunctive, and conclude that a CON is valid only for either the particular premises named in an application for the offering of a new service in an existing facility, or for the specific geographical area named in an application for the construction of a new facility.

■ We next turn to the question of whether RANE commenced the project within the time frame permitted by the CON which had been awarded to it. RSA 151-C:12, III (Supp. 1988) states that a project shall be commenced if:

"(a) The applicant has submitted to the board a certified copy of a written agreement executed between the applicant and a registered general contractor to construct and complete the project within a designated time schedule in accordance with final architectural plans and specifications; or

"(b) The applicant has submitted evidence to the board that there has been construction work on the project to justify and require a progress payment by the applicant to the general contractor under the terms of the construction agreement."

On April 6, RANE submitted to the board a copy of the contract it had entered into with Commercial Construction, Inc., a general contractor, certification of the contract by the president of the corporate general partner of RANE, and a copy of a check payable to Commercial Construction, Inc. in the amount of $18,370. The contract, as mandated by the statute, required the contractor to complete the facility in accordance with final architectural plans and specifications by April 6, 1989. *See* RSA 151-C:12, III(a) (Supp. 1988). RANE's submission of the contract and the certification to the board brought RANE into compliance with RSA 151-C:12, III(a) (Supp. 1988). The contract required the contractor to perform "initial work" of cutting entrance and access roads, installing water lines, and causing the digging of test pits to assess soil-bearing capacity. Upon the completion of this "initial work," a progress payment of $18,370 was due the contractor. A copy of a check made payable to the order of the construction company in that amount was sent to the board, demonstrating that there had "been construction work on the project to justify and require a progress payment by the applicant to the general contractor under the terms of the construction agreement" in accordance with RSA 151-C:12, III(b) (Supp. 1988). We conclude that RANE commenced construction of its facility on the grounds of Concord Hospital within the required period.

Because we hold that RANE's CON is valid for construction on the Concord site, and that RANE had commenced the project within the time allowed by statute, we need not consider whether RANE had "good cause" for, and was thus entitled to, a six-month

extension of the commencement period in accordance with RSA 151-C:12, II (Supp. 1988).

*Appeal granted.*

SOUTER and THAYER, JJ., did not sit; BROCK, C.J., dissented; BATCHELDER, J., concurred.

BROCK, C.J., dissenting: I would hold that RANE's resituation of its planned physical rehabilitation facility was a change in location requiring prior board approval under RSA 151-C:8, XII(b)(1) (Supp. 1988).

The majority reason that because RANE did not move the facility outside of the Concord region, it was within the same "Concord region service area" as Allenstown and, thus, the "location" of the hospital did not change. However, they fail to address the fact that the service area of the proposed facility, as stated specifically by RANE in its CON application, encompasses the entire State of New Hampshire. To subscribe to the majority's analysis would therefore allow RANE to resite its facility anywhere in the State without prior board approval. This result clearly was not within the intention of the legislature when it enacted the comprehensive and stringent statutory requirements of RSA chapter 151-C.

Although the definition of a term in a statute usually controls its meaning, *see Piper v. Railroad*, 75 N.H. 435, 442, 75 A. 1041, 1046 (1910), this court will not interpret a statute "so as to produce an unjust and seemingly illogical result." *Appeal of Coastal Materials Corp.*, 130 N.H. 98, 105, 534 A.2d 398, 402 (1987). The intent of the legislature, rather than the "canons of statutory construction, is controlling." *Chagnon v. Union-Leader Corp.*, 104 N.H. 472, 474, 129 A.2d 721, 722 (1963). The majority's interpretation of "location" in this case plainly undermines the express purpose of the statute to promote the "rational allocation of health care resources in the state." For these reasons, I respectfully dissent.