Health Services Planning and Review Board
No. 89-554

APPEAL OF SALEM REGIONAL MEDICAL CENTER
(New Hampshire Health Services Planning and Review Board)

May 3, 1991

208

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*William J. Donovan* on the brief and orally), for the petitioner, Salem Regional Medical Center.

*Sulloway Hollis & Soden*, of Concord (*Eleanor H. Holmes* on the brief and orally), for the respondent Massachusetts intervenors.

*Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C.*, of Boston, Massachusetts (*Stephen M. Weiner* on the brief and orally), for the respondent Parkland Medical Center.

THAYER, J. This is an appeal by the Salem Regional Medical Center (SRMC) from the State Health Services Planning and Review Board's (the board) decision of November 22, 1989, denying SRMC's application for a certificate of need (CON) to construct a new ninety-bed hospital in Salem. SRMC alleges that the board's ruling is unreasonable and illegal, because (1) the board violated the equal rights provision of the State Constitution by inappropriately applying travel access standards to SRMC's CON application, (2) the board's finding that SRMC failed to demonstrate an unmet need was against the weight of evidence, and (3) the board erroneously calculated bed need for the hospital's proposed service area. SRMC further alleges that the board acted illegally in allowing its staff director to address the board in opposition to SRMC's application during the board's executive session. We affirm the board's denial of SRMC's CON application.

In November of 1987, SRMC, a subsidiary of Health NorthEast, Inc., filed with the board an application for a CON to construct a new ninety-bed hospital in Salem. At that time there were no standards by which the board could evaluate applications for the construction of *new* acute care facilities. Therefore, pursuant to RSA 151-C:5, II, the board formed a task force that included a representative of Elliot Hospital, which is also a subsidiary of Health NorthEast, Inc., to develop standards and criteria to assess proposals to build new hospitals. As a result, the board adopted the development and construction standards found in New Hampshire Administrative Rules He-Hea 1005–1006, and then issued a request for proposals for capital projects to build, expand, renovate, or replace acute care facilities. On November 1, 1988, in response to the board's request, SRMC resubmitted its proposal to build a ninety-bed hospital in Salem that would serve Salem, Pelham, Windham, Atkinson, and Hampstead ("Greater Salem").

In its CON application, the petitioner emphasized the relative size of Salem's population within New Hampshire, and the absence of a full-service community hospital in any town within Greater Salem. SRMC anticipated that approximately seventy percent of its project's utilization would come from New Hampshire residents who traditionally receive their care in Massachusetts hospitals. There are currently nine existing hospitals in New Hampshire and Massachusetts which serve the residents of the Salem area. Consequently, the six Massachusetts hospitals, Holy Family Medical Center, in Methuen; St. Joseph's Hospital, Lowell General Hospital, and St. John's Hospital, all in Lowell; Hale Hospital, in Haverhill; and Law-

rence General Hospital, in Lawrence, were granted intervening party status. The board ruled that all Massachusetts hospitals were to be considered one party. Additionally, Parkland Medical Center and three other New Hampshire hospitals were granted intervening party status.

Extensive hearings on SRMC's CON application were held in May and June of 1989. In May of 1989, the board's staff conducted its analysis of the data and projections submitted in petitioner's CON application and recommended that the application be denied. On August 9, 1989, the board adopted this recommendation and voted unanimously to deny SRMC's application. Subsequently, SRMC filed a request for a rehearing and reconsideration of the board's decision pursuant to RSA 541:3 and RSA 151-C:9. The board granted the request, and on October 20, 1989, the reconsideration hearing was held. After new deliberations on SRMC's application, the board voted unanimously on November 22, 1989, to affirm its prior ruling. SRMC then appealed to this court pursuant to RSA 151-C:10.

SRMC challenges the board's order in basically two respects. The first argument attacks the substance of the board's findings, whereas the second attacks the procedure the board used to arrive at its findings. In reviewing the board's actions, we are guided by RSA 151-C: 10, which provides that RSA chapter 541 shall govern all appeals to this court and instructs us to affirm the board's decision unless SRMC establishes that the board's decision was "arbitrary or capricious or not made in compliance with applicable law." RSA 151-C:10, III.

> "[T]he burden of proof shall be upon the party seeking to set aside any order or decision of the [board] to show that the same is clearly unreasonable or unlawful, and all findings of the [board] upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable."

RSA 541:13. Mindful of these limitations on the scope of our review, we turn first to the petitioner's claims that the board's findings were unreasonable.

Essentially, all three of SRMC's substantive claims attack the board's finding that the petitioner failed to establish an unmet need for an acute care facility in Greater Salem. The first claim asserts

that it was not reasonable for the board to have found the absence of an unmet need, in light of the evidence demonstrating deficiencies in access to hospitalization for the communities comprising Greater Salem. The second claim argues that the board's application of the fifteen-mile/thirty-minute travel access standard violates the equal protection clause of the State Constitution by arbitrarily classifying the residents of Greater Salem. The third claim challenges the board's calculation of bed need.

In this appeal, for the first time, this court has been called upon to assess New Hampshire Administrative Rules He-Hea 1005–1006. These rules were adopted to provide the board with the necessary guidance to review proposals for the construction of new hospitals, and the rules permit the approval of such a proposal only when it can be demonstrated that there exists a need for a new hospital. *See New Hampshire Hospital Standards, Introduction*, N.H. ADMIN. RULES, He-Hea 1005–1006. In providing this guidance, the regulations establish several criteria for assessing need, including a bed need formula, the proposal's impact on existing facilities, the travel time and distance to existing hospitals, as well as other objective standards. N.H. ADMIN. RULES, He-Hea 1005.02–1005.13. The board is required to apply these standards during its decision-making process. *See Appeal of Rehab. Assoc's of N.E.*, 131 N.H. 560, 563–64, 556 A.2d 1183, 1186 (1989). Our review of the record leads us to conclude that there exists ample evidence to support the board's decision.

In its brief, SRMC listed thirty-two witnesses who testified in support of its application, and asserted that this amount of testimony created such a substantial weight of evidence that the board was compelled to find that an unmet need existed. As the trier of fact, however, the board was not bound to assume that the quantity of evidence produced during the hearings was a measure of its probative value. *See Doubleday v. Doubleday*, 131 N.H. 250, 251, 551 A.2d 525, 526 (1988). Besides hearing from various supporters of SRMC's proposal, the board also heard testimony from several representatives of the intervening hospitals that currently provide health-care services to Greater Salem. Through this testimony, the board learned of the possible negative effects created by adding ninety new beds to the area. For instance, the administrator of Parkland Medical Center testified that Salem, by itself, represents fifteen percent of Parkland's total inpatient business. Similarly, Holy Family and Lawrence General Hospitals rely, in part, on patients from Greater

Salem to sustain their inpatient business. Representatives from these hospitals provided testimony indicating that SRMC's proposal could potentially *reduce* the number and quality of services currently available to Greater Salem. This testimony suggested that the addition of a new facility in the area would lower occupancy rates at existing hospitals and thereby reduce hospital revenues. This consequence would raise patient costs and force existing hospitals to reduce currently available services.

■■ As an appellate court, we do not decide which evidence the board should have accepted and which evidence should have been rejected. What weight the board applied to the evidence before it is "a matter of reasoned discretion in the fact-finding process[,] [a]nd as a matter of logic, decision-making always necessitates relying more on some information than on other." *Paras v. Portsmouth*, 115 N.H. 63, 68, 335 A.2d 304, 308 (1975). When considering the weight and tenor of the evidence before the board, we must conclude that SRMC has failed to meet its substantial burden of proving, by a preponderance of the evidence, that the board's findings on unmet need and acute care accessibility are clearly unreasonable or unlawful.

We next address the petitioner's claims that the board's application of the travel access standard violates its constitutional rights, as well as the constitutional rights of the residents of Greater Salem. SRMC's constitutional claims focus on the board's application of New Hampshire Administrative Rule He-Hea 1005.02(b)(1), and its fifteen-mile/thirty-minute travel access standard. This standard compels the board to consider whether an applicant's proposal for a CON to construct a new hospital will place the new facility in a community whose residents presently must travel at least fifteen miles or thirty minutes in order to receive hospital care. This standard is nothing more than a general guideline used to assess the practical placement of a proposed hospital, and any CON application which can meet its guidelines will obviously be considered more meritorious than one which cannot. Contrary to SRMC's assertions, the travel access standard is only one of many criteria the board applied to SRMC's proposal in order to determine whether there exists an unmet need for an acute care facility in Greater Salem. We find nothing in the record which indicates that the board applied the standard as an absolute cut-off.

The petitioner argues that the board's application of the travel access standard results in a constitutionally impermissible classification, because it causes the residents of Greater Salem to be treated

differently than the residents of other New Hampshire communities. In other words, SRMC contends that this standard should not be applied to its CON application, because it prevents construction of a hospital in Greater Salem, while other densely-populated communities in New Hampshire have the benefit of local hospitals. Second, SRMC argues in its brief that the board has not applied the standard equally to all CON applications, as evidenced by the board's approval of a seventeen-bed expansion for Parkland Medical Center, despite Parkland's inability to meet the fifteen-mile/thirty-minute test. Thus, SRMC contends that the board has violated its equal protection rights by treating its CON application differently than Parkland's CON application. However, neither one of SRMC's constitutional arguments is valid.

In support of its first equal protection argument, SRMC states in its brief that "[t]here is almost no circumstance for any citizen of southern New Hampshire where they are required to travel even 15 minutes to the nearest hospital. This is the real standard of care established by New Hampshire's public health system." SRMC then contends that

> "the people of Salem are entitled to have the same planning standards applied to them as are applied to the rest of the State. If hospitals are generally within 10 minutes reach for most citizens in the populated areas of the State then this is the standard by which Salem should be measured."

SRMC's argument thus appears to be that residents of surrounding, highly populated communities are treated better than those of Greater Salem because a different, more beneficial standard is applied to these other communities. This argument, however, merits little discussion. We can find no evidence that such a ten-minute travel access standard has been, is being, or will be applied by the board to communities surrounding Greater Salem, and SRMC has provided none. All CON applications are equally subject to the same standards, which includes consideration of the fifteen-mile/thirty-minute travel access standard.

SRMC's second equal protection argument involves the distinctions that are made, in the regulations on CON application review, between new and already existing hospitals. The regulations require the board to apply the travel access standard to CON applications to build new hospitals, but do not require the standard to be applied to CON applications to expand existing hospitals. Thus, SRMC asserts that the class of persons who apply for a CON to build a new hospital

and must establish an unmet need for a specific number of hospital beds in a particular community is being treated differently than persons who wish to expand existing hospitals. The petitioner further argues that this classification has no reasonable justification. However, assuming the truth of the petitioner's allegation that the regulations in question treat persons similarly situated differently, we can find no basis for holding that the classification violates the equal protection clause of the State Constitution.

 Where a regulatory framework creates a classification, we must determine the appropriate standard by which to judge the constitutionality of the classification. Although the petitioner does not argue a need for strict scrutiny in testing the validity of this classification, it does assert that we should apply the middle-tier test of heightened scrutiny. *See Carson v. Maurer*, 120 N.H. 925, 931–32, 424 A.2d 825, 830–31 (1980). However, SRMC's rights are not "important, substantive right[s]" requiring the application of State middle-level scrutiny. *Id.*

 Rather, SRMC's rights are primarily economic, and thus "[i]t follows that under the State standard the classification must be judged by asking whether it bears a rational relationship to the effectuation of a legitimate State interest." *See State v. Heath*, 129 N.H. 102, 110, 523 A.2d 82, 87–88 (1986). In judging the classification, we need not independently examine the factual basis which justifies the disparate treatment alleged by the petitioner in this case. *See Carson, supra* at 933, 424 A.2d at 831 (no need to examine the factual basis justifying classification when applying middle-tier test of heightened scrutiny). Rather, SRMC, as the party challenging the constitutionality of the classification, has the burden of proving that the distinction does not pass the rational basis test. *Petition of State Employees' Assoc. & Goulette*, 129 N.H. 536, 540, 529 A.2d 968, 971 (1987). SRMC has not met this burden.

 There is no question that the travel access standard passes muster under the rational basis test. The board is empowered to ensure the fulfillment of a legitimate State interest: the "rational allocation of health care resources." RSA 151-C:1, I. The regulations which guide the board's evaluation of CON applications establish two different categories of applicants: those who propose to build new acute care facilities, *see* N.H. ADMIN. RULES, He-Hea 1005–1006, and those who propose to expand existing acute care facilities, *see* N.H. ADMIN. RULES, He-Hea 1000–1004. This distinction is ra-

tionally related to the allocation of health care resources for several reasons. Existing hospitals have an existing infrastructure that can absorb an expansion without the same level of costs incurred by the construction of a new hospital. Therefore, existing hospitals do not rely upon an expansion of inpatient services to provide the same level of revenues needed to maintain the day to day operations of the facilities. A new hospital, on the other hand, requires a greater number of beds to maintain its operations because there are no existing inpatient services which generate revenue. Therefore, by virtue of the larger numbers of beds needed to support the operation of a new hospital, expanding an existing hospital does not have as great an effect on the utilization and financial viability of surrounding hospitals as the construction of new hospitals. Furthermore, it would be inappropriate to apply the travel access standard to a petition to expand an existing hospital because there is no need to assess the practical location of an existing facility. Instead, how an expansion affects other hospitals serving the same service area is measured by other, relevant criteria found in New Hampshire Administrative Rules He-Hea 1000–1004. Thus, the distinctions created by the regulations bear a rational relationship to a legitimate State interest, and SRMC's second equal protection claim fails.

We next address the petitioner's contention that the board incorrectly calculated the bed need for Greater Salem and thus erred in finding that no new beds are needed in that area. The petitioner attributes the board's error to what it characterizes as "major clerical errors" in the quantitative analysis of bed need. New Hampshire Administrative Rules He-Hea 1005.03 and 1004.09, by reference from 1005.07, provide the two health planning standards that the board is required to use in its quantitative analysis of need. The first, and simpler, of these standards provides that "[n]o request for a new hospital shall cause the total number of acute care beds *statewide* to exceed 3.2 beds for every 1000 persons living in New Hampshire." N.H. ADMIN. RULES, He-Hea 1005.03 (emphasis added). The board specifically found that SRMC's CON application did not violate this standard. Regardless, SRMC argues that the 3.2-beds standard should be applied to the population within the proposed service area in order to determine actual bed need within that area, rather than applying the 3.2-beds standard on a statewide basis. The petitioner contends that the application of this standard to the specific service area will reveal the need for 208 beds in Greater Salem, rather than the 116 determined by the board. We find this argument unpersuasive.

■ SRMC's use of the 3.2/1000 population formula is wholly misplaced. New Hampshire Administrative Rule He-Hea 1005.03 is, by its own terms, a statewide formula. Specific service area analysis is provided elsewhere in the regulations, *see* N.H. ADMIN. RULES, He-Hea 1004.09, 1005.07, and there is no intention that He-Hea 1005.03 be a service-area-specific standard. The 3.2-beds standard, on the other hand, provides a ceiling on the number of beds state-wide, rather than a goal that should be obtained. This ceiling reflects the policy of the State that 3.2 beds for every 1000 residents repre-sents a reasonable balance between the availability and the need for acute care facilities. We can find no error in the board's refusal to apply this standard specifically to the Greater Salem area.

The petitioner next asserts that the board misapplied New Hamp-shire Administrative Rule He-Hea 1005.07. This regulation estab-lishes the formula appearing at He-Hea 1004.09 as the proper method for calculating bed need in a specific service area. The princi-pal elements of this formula include determining future patient days through projections of use rate, market share and population, and "reasonable occupancy," calculated by using the "Normile Formula" of New Hampshire Administrative Rule He-Hea 1004.04. This for-mula calculates, within certain probability limits, the "reasonable oc-cupancy" which must be maintained if a hospital is to insure available beds. "Reasonable occupancy," as determined by the "Nor-mile Formula," is then used to calculate "bed need." The number yielded from the formula is considered the "optimum number of beds for the facility." *Id.* The board relied upon its staff's calculations to determine bed need for Greater Salem. Therefore, our inquiry as to the board's quantitative analysis must begin with the staff analysis and its recommendations on SRMC's CON application.

Because Greater Salem does not have a hospital within the service area, the staff used data from the nine hospitals that have tradi-tionally served the area to determine use rate and occupancy. Through this data the staff found that the use rate (the number of patient days per 1000 persons living in Greater Salem) declined dur-ing the three years preceding the petitioner's CON application. The demographics of Greater Salem also suggest that the population of this area is younger and, therefore, less likely to need inpatient hos-pital services than other communities in the State. As a result, the staff concluded that this trend in use rate would not stop or reverse itself in the near future. This finding indicates that the need for inpa-tient hospital services in Greater Salem will not grow with the popu-lation. The staff's analysis under the "Normile Formula" concluded

that 116 beds were needed to serve Greater Salem. The staff also found that there are currently 120 beds allocated to Greater Salem among the nine hospitals serving that area.

SRMC contends, however, that the staff's calculation under the "Normile Formula" suffers from two major errors. First, the petitioner argues that the staff's calculation of future patient days is wrong, because the staff excluded twenty-four percent of the total patient days for Greater Salem. This percentage of total patient days represents hospital use by residents of Greater Salem who have sought care outside the traditional service area. In other words, roughly twenty-four percent of the hospital use by residents of Greater Salem involved their traveling to Boston or Manchester to receive treatment. These patients have not sought care at one of the nine area hospitals for a number of possible reasons. For example, many patients receive care elsewhere because the nature of care needed is not available at any of the local hospitals. As the board found, no evidence produced by SRMC suggests that this pattern of care seeking will be altered by construction of the proposed facility. The fact that SRMC is not proposing to provide any services not already available at one of the nine hospitals currently serving Greater Salem supports the reasonableness of this finding. Therefore, the exclusion of twenty-four percent of the total patient days from the calculation of bed need was neither arbitrary nor erroneous.

Second, SRMC contends that the staff analysis improperly used data on 1987 patient days in the calculation of bed need, instead of using future patient days as required by He-Hea 1005.07 and 1004.09. This argument, however, is simply erroneous. In determining future bed need the staff used projected population figures and projected use rates to determine future patient days. The 1987 population and utilization information cited by the petitioner in making this argument was used only to calculate reasonable occupancy according to He-Hea 1005.04 and 1004.04. We find no error in the staff's calculation of the "Normile Formula."

SRMC also asserts that the staff overstated the number of available beds, because it (1) used admissions data, rather than patient days, to determine degree of use, and (2) the staff failed to adjust the total number of beds available at Massachusetts hospitals to reflect reductions in licensed capacity at these hospitals. Neither of these arguments, however, persuades us that the staff's calculation of available beds is erroneous.

The staff's assessment of bed allocation and use plainly used patient days to arrive at the 120-bed figure relied upon to determine current bed need. According to the staff report, this analysis involved allocation of available beds to the various communities served, by "comparing the number of patient days generated at each of [the] nine hospitals [by patients from a particular town] to the total number of patient days at the facility." Although the staff report lists admissions data to determine the allocation of bed need among the nine area hospitals, nothing in the record suggests that the use of patient days rather than admissions would have affected the board's decision. Clearly, the staff contemplated patient days when it calculated the number of available beds among the nine local hospitals used by residents of Greater Salem. Moreover, the petitioner produces no authority which requires that the degree of use be calculated by patient days rather than admissions. "[T]he construction of a statute by those charged with its administration is entitled to substantial deference." *N.H. Retirement System v. Sununu*, 126 N.H. 104, 108, 489 A.2d 615, 618 (1985). Therefore, we hold that the board committed no error in adopting its staff's calculation of the number of beds currently available to the residents of Greater Salem.

Similarly, we find no error in the staff's calculations, despite the petitioner's assertion that the licensing capacity of the six Massachusetts hospitals has been reduced by a Massachusetts statute. *See* Act of April 21, 1988, ch. 23, 1988 Mass. Acts 85. Although the statute in question has reduced the number of licensed beds currently in service at these hospitals, the capacity of the Massachusetts hospitals has remained unchanged. SRMC ignores another provision of this act that adjusts the number of licensed beds in each hospital according to occupancy levels. *See id.* at § 38, 123–24. In effect, chapter 23 does not make beds unavailable, it only requires that beds be taken out of service during periods of low occupancy rates. *See id.* Once occupancy increases to a sufficient level, the beds are put back into service. Consequently, the statute does not reduce the number of beds available to the residents of Greater Salem, and the board was not bound to disregard those beds that exist but are not presently in service at Massachusetts facilities.

Finally, we address SRMC's procedural claim that it was severely prejudiced by the staff director's participation in the board's June 29, 1989, executive session on SRMC's CON application, in violation of RSA chapter 91-A. Because the board's staff ar-

ticulated its opposition to SRMC's application in its staff analysis, SRMC contends that any active involvement by the staff director in the board's executive session on SRMC's application was prejudicial to SRMC's interests. We have no method of determining what role, if any, the staff director played in the board's deliberations on the petitioner's CON application during the executive session. SRMC does not state how it was prejudiced. The board understood the staff director's position and was entitled to consider her recommendation. Furthermore, the board voted to rehear SRMC's proposal, and subsequently held another board meeting at which the proposal was deliberated and ultimately denied. SRMC does not claim that the staff director participated in that meeting, nor does the petitioner argue that the staff director's earlier involvement tainted, in any way, the board's vote on reconsideration. Thus, even if the presence of the board's staff director at the executive session violated RSA chapter 91-A, the subsequent reconsideration hearing and board meeting cured any error.

*Affirmed.*

All concurred.