Health Services Planning and Review Board
No. 2004-824

APPEAL OF ST. JOSEPH HOSPITAL
(New Hampshire Health Services Planning and Review Board)

Argued: September 14, 2005
Opinion Issued: November 16, 2005

742

*Hinckley, Allen & Snyder LLP*, of Concord (*Neil F. Castaldo* and *Christopher H.M. Carter* on the brief, and *Mr. Carter* orally), for the petitioner.

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Eugene M. Van Loan, III*, on the brief and orally), for the respondent.

DUGGAN, J. The petitioner, St. Joseph Hospital (St. Joseph), appeals a decision of the New Hampshire Health Services Planning and Review Board (board) that the proposal by the respondent, Northeast Rehabilitation Hospital (Northeast), to relocate fifteen comprehensive physical rehabilitation beds from Northeast's facility in Salem to the campus of Southern New Hampshire Medical Center in Nashua is not subject to review by the board under RSA chapter 151-C (2005). Northeast cross-appeals the board's decision that St. Joseph had standing to move for reconsideration of the board's decision. We affirm.

In 1982, the board issued a Certificate of Need (CON) to Northeast for the construction of a rehabilitation hospital. In its application, Northeast described its service area as including the Merrimack Valley of Massachusetts and all of New Hampshire, excluding Coos, Grafton, and Carroll counties. The CON identified the new institutional health service as "[c]onstruction of a 102 bed comprehensive rehabilitation hospital . . . to be located on Butler Street, Salem, NH."

On May 6, 2004, Northeast notified the board of its intention to relocate fifteen of its 102 beds from Salem to a new location on the campus of Southern New Hampshire Medical Center in Nashua. Northeast requested a determination from the board that the proposed relocation was not subject to board review. The board held a hearing on the petition and issued an order that the relocation was not subject to review, provided that the cost of the relocation remained below certain statutory thresholds.

On June 17, 2004, St. Joseph moved for reconsideration of the board's order and requested a hearing on Northeast's petition, alleging that the proposed relocation required the issuance of a CON. Northeast objected on the ground that St. Joseph lacked standing to request reconsideration, as it was not a party to the proceedings. After a hearing on the issue of standing, the board granted St. Joseph's motion and scheduled a rehearing on Northeast's petition. After the rehearing, the board issued a decision which included, among other things, the following findings regarding the proposed relocation: (1) Northeast will reduce the number of beds at its Salem facility by fifteen; (2) the total number of comprehensive rehabilitation beds in the southern New Hampshire region will not change; (3) Southern New Hampshire Medical Center and Northeast will remain separate and distinct corporate entities; (4) the role of Southern New Hampshire Medical Center will be limited to that of landlord, without any control or influence over the clinical practices, administration or operation of Northeast; (5) the proposed relocation will not change the identity of the CON applicant; and (6) the location of the relocated beds will not differ substantially from that described in Northeast's CON application. The board upheld its original order that the proposed relocation was not subject to board review.

On appeal, Northeast argues that the board erred in determining that St. Joseph had standing. We will assume, without deciding, that St. Joseph had standing and reach the merits of its appeal. *See Stuart v. State,* 134 N.H. 702, 704 (1991).

St. Joseph argues that the proposed relocation is subject to review under RSA chapter 151-C because: (1) the proposed relocation constitutes the establishment of a new institutional health service under RSA chapter 151-C; (2) the proposed relocation constitutes a transfer of rehabilitation

beds under board regulations, N.H. ADMIN. RULES, He-Hea 702.06(e), (j); and (3) Northeast's existing CON does not permit, absent CON review, the relocation of beds from the named facility in Salem to another existing facility in Nashua.

Appeals under RSA chapter 151-C are governed by RSA chapter 541 (1997 & Supp. 2004). RSA 151-C:10, II. "[W]e deem all factual findings by the board to be prima facie lawful and reasonable . . . ." *Appeal of N.E. Heart Inst.*, 144 N.H. 546, 548 (1999) (quotation omitted). We will affirm the board's decision unless we find, by a clear preponderance of the evidence, that it was arbitrary or capricious or not made in compliance with applicable law. *Id.* at 547-48; *see also* RSA 151-C:10, III; RSA 541:13 (1997). Whether the board erroneously determined that the proposed relocation is not subject to review is an issue of law that we review *de novo.* Cf. *Appeal of Portsmouth Regional Hosp.*, 148 N.H. 55, 57 (2002).

*I. "New Institutional Health Service"*

■ Pursuant to RSA 151-C:4, I, no "new institutional health service" may be offered or developed within the State without first obtaining a CON from the board. The term "new institutional health service" is defined to include, among other things, "the development and offering of new inpatient services" and "the increase or conversion of inpatient beds." RSA 151-C:2, XXII; RSA 151-C:5, II(c), (e). St. Joseph argues that both of these provisions bring the proposed relocation within the statutory definition of "new institutional health service."

First, St. Joseph contends that the proposed relocation constitutes "the development and offering of new inpatient services" because it will create a newly-licensed facility in Nashua where inpatient rehabilitation services were not previously offered. In response, Northeast contends that the service is not "new" because inpatient rehabilitation services are already offered by Northeast in the southern New Hampshire regional service area, *see* N.H. ADMIN. RULES, He-Hea 702.03, and under the proposed relocation, such services will continue to be offered by Northeast in that service area.

St. Joseph also argues that the proposed relocation constitutes an "increase of inpatient beds" because it will result in an increase in the total number of inpatient rehabilitation beds in the Nashua area. Northeast contends that no increase will result because neither the number of inpatient rehabilitation beds in any of the regional rehabilitation service areas, nor the number of beds offered by Northeast, will change.

At the hearing and rehearing before the board, Northeast demonstrated that the relocated beds would continue to be owned by and licensed to Northeast, that the rehabilitation services would be provided either by

Northeast personnel or by personnel of Southern New Hampshire Medical Center under Northeast's control and supervision, and that the patients would be patients of Northeast and billed by Northeast. The board found that Southern New Hampshire Medical Center would merely be Northeast's landlord, and that the two hospitals would remain separate and distinct entities. We find nothing arbitrary or capricious in these findings of fact. Thus, we consider only whether, given these facts, Northeast's offering of services in Nashua constitutes a "new inpatient service" or an "increase of inpatient beds."

"In construing a statute, we ascribe the plain and ordinary meaning to words used, considering the statute as a whole and interpreting it consistent with its purpose." *Appeal of Boucher*, 148 N.H. 458, 460 (2002) (quotation omitted). One purpose of RSA chapter 151-C is to ensure that "all new institutional health services [are] offered or developed in a manner which avoids unnecessary duplication . . . and promotes rational allocation of health care resources in the state." RSA 151-C:1, I.

Pursuant to RSA chapter 151-C, the board has developed standards for determining the need for comprehensive physical rehabilitation services. *See* RSA 151-C:5, III; N.H. ADMIN. RULES, He-Hea 702. The standard for determining need is a regional one. N.H. ADMIN. RULES, He-Hea 702.01. The board has divided the State into five regional rehabilitation service areas; the southern region includes both Nashua and Salem. *Id.* 702.03. The board determines the need in each service area according to the population of the entire service area. *Id.* 702.01-.02. Then, when reviewing individual CON applications, the board considers, among other factors, the unmet need in the regional service area, the impact of the new service on the existing services throughout the regional service area, and the demographic characteristics for the entire regional service area. *Id.* 702.04, .10, 703.01(d). We find nothing in the statute or regulations to indicate that needed comprehensive physical rehabilitation services are allocated by any geographical unit other than by regional service area. This reflects a determination by the board that the policy of promoting the rational allocation of rehabilitation services is served by allocating those resources on a regional basis. Therefore, we conclude that, for the purposes of RSA chapter 151-C and the regulations promulgated thereunder, when determining whether, within a geographical area, there is a new inpatient rehabilitation service being offered or an increase in inpatient rehabilitation beds, the board need only consider the regional service areas defined in the board regulations. *Id.* 702.03.

The board found that the proposed relocation would change neither the total number of beds in the southern region service area, nor the total

number of beds being offered by Northeast. Therefore, the proposed relocation is not subject to review under RSA chapter 151-C on the ground that it is a "new institutional health service" because it does not constitute a "new inpatient service" or an "increase of inpatient beds."

## II. "Transfer"

Board regulations regarding comprehensive physical rehabilitation services contain a series of rules governing the "transfer" of rehabilitation beds. *See id.* 702.06(e)-(k). These regulations permit the holder of a CON for rehabilitation beds to "transfer all or a portion of those beds to another [hospital] in the same region provided notice is made to the board." *Id.* 702.06(e). However, "[a]ny facility receiving the transferred beds" is subject to the statutory and regulatory CON requirements for the increase or conversion of inpatient beds and for comprehensive physical rehabilitation services. *Id.* 702.06(j). St. Joseph argues that the proposed relocation constitutes a transfer of rehabilitation beds from Northeast to Southern New Hampshire Medical Center, and is thus subject to review under RSA chapter 151-C.

The term "transfer" is not defined in the regulations. *See id.* 701.01. St. Joseph argues that "transfer" refers to a change in physical location of beds, whereas Northeast argues that "transfer" refers to a transfer of ownership of the CON for beds. In deciding that the proposed relocation was not subject to review, the board rejected St. Joseph's argument and interpreted "transfer" to refer to a transfer of ownership. "While deference is accorded to an agency's interpretation of its regulations, that deference is not total. A reviewing court must still examine whether the agency's interpretation is consistent with the language of the regulation and with the purpose which the regulation was intended to serve." *Appeal of Morin,* 140 N.H. 515, 518 (1995) (quotation omitted).

"In construing rules, as in construing statutes, where possible, we ascribe the plain and ordinary meanings to words used." *Appeal of Flynn,* 145 N.H. 422, 423 (2000) (quotation omitted). The definition of "transfer" has many variations, including "to carry or take from one person or place to another," "to move or send to a different location [especially] for business ... purposes," or "to make over or negotiate the possession or control of (a right, title, or property) by a legal process [usually] for consideration." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2426-27 (unabridged ed. 2002). These definitions offer little guidance in distinguishing between a transfer of location and a transfer of ownership. When regulatory language contains a word that is susceptible to multiple constructions, we adopt the meaning which best harmonizes with the

context and with the apparent policy of the agency. *Appeal of Hoyt Rental & Leasing Co.*, 130 N.H. 130, 132-33 (1987).

Thus, we look next to the context of the two transfer provisions upon which St. Joseph relies and the apparent policy of the board in promulgating these regulations. Whenever the holder of a CON for rehabilitation services transfers beds to another hospital in the same region, "the facility intending to transfer the beds and the facility receiving the beds" must jointly notify the board of the transfer, including in the notice the identity of the transferring facility and the identity of the receiving facility. N.H. ADMIN. RULES, He-Hea 702.06(f)-(g). That notice must be signed by "both parties." *Id.* 702.06(g). Any purchase price paid by the transferee is not included in the calculation of the project cost. *Id.* 702.06(k). In the context of these provisions, it is reasonable to interpret "transfer" to mean a transfer between two separate and distinct entities, and not merely a transfer from one physical location to another.

Furthermore, the policy of the board in promulgating its regulations must be consistent with the policy of the board's enabling statute. As noted, one purpose of RSA chapter 151-C is to promote rational allocation of health care resources in the State. RSA 151-C:1, I. As we explained above, the board has made clear through its rules that regional allocation of rehabilitation services serves this purpose. Thus, the specific location of the services within the region may be irrelevant to the board in its effort to promote the rational allocation of rehabilitation services.

By contrast, the regulations governing comprehensive rehabilitation services make clear that the identity of the holder of the CON is of significant interest to the board. In undertaking a review of a CON application for rehabilitation services, the applicant must demonstrate to the board the adequacy of its treatment policies, N.H. ADMIN. RULES, He-Hea 702.07, the appropriateness of its quality assurance program, *id.* 702.09, and other provider-specific criteria. *See id.* 700. If the ownership of a CON changes without notification to or review by the board, the board may never receive much of the information that it deems critical to the application review process.

■ We conclude that defining "transfer" to refer to a transfer of ownership, rather than a transfer of physical location alone, best harmonizes with the context of the regulations and policies of the board. Furthermore, we defer to the board's interpretation, finding that it is reasonable and consistent with the language of other regulations governing the transfer of rehabilitation beds, the language of RSA chapter 151-C, and the purpose that the regulations were intended to serve. *See N.H. Retirement System v. Sununu,* 126 N.H. 104, 108 (1985).

### III. The Existing CON

St. Joseph argues that Northeast's existing CON does not permit, absent CON review, the relocation of beds from the named facility in Salem to another existing facility in Nashua.

Once a project proposed in a CON application is operational, the CON is "valid only for the designated scope of the project and for the premises and geographical area named in the application." RSA 151-C:12, IV. Thus, a change in scope, premises or geographical area requires board approval. *Cf. Appeal of Rehab. Assoc's of N.E.*, 131 N.H. 560, 564 (1989) (hereinafter cited as *RANE*). The words "scope," "premises" and "geographical area" are not defined in the statute. *See* RSA 151-C:2.

■ First, St. Joseph argues that the proposed relocation constitutes a fragmentation of services not contemplated by the board in the issuance of Northeast's CON, and thus results in a change in the scope of Northeast's project. "Scope" denotes "the general range or extent of activity." *RANE*, 131 N.H. at 565 (quotation and ellipses omitted). In *RANE*, we interpreted a change in the "scope" of a project to include factors such as a change in the number of beds or a substantial change in the total capital expenditure of the project, but to exclude a change of site without a change in service area. *Id.* at 565-66. Therefore, under *RANE*, Northeast's proposal to move some of the beds from the site identified in its CON to another site within the same service area does not constitute a change in the scope of the original CON.

■ Second, St. Joseph argues that the proposed relocation will result in a change in Northeast's premises or geographical area. Northeast's CON, as issued, identifies the location of Northeast's rehabilitation services as Butler Street in Salem. However, in *RANE*, we held that a CON is valid for the entire geographical area identified in an application for the construction of a new facility, regardless of the site identified in the CON. *RANE*, 131 N.H. at 566. In this case, the original application filed by Northeast in the early 1980s was for construction of a new facility to service parts of Massachusetts and all of New Hampshire, excluding only Coos, Grafton, and Carroll counties. Thus, Northeast can, consistent with its CON, relocate beds from Salem to Nashua.

St. Joseph seems to suggest that our application of *RANE* to this case should take into consideration the fact that, since *RANE* was decided in 1989, the board's regulations have been revised to require that all applicants identify the specific location at which they plan to provide

services. *See* N.H. ADMIN. RULES, He-Hea 304.05(a). However, St. Joseph makes no argument as to why the current regulations should apply to a CON issued in 1982.

We therefore affirm the decision of the board that Northeast's proposed relocation is not subject to review under RSA chapter 151-C.

*Affirmed.*

BRODERICK, C.J., and NADEAU, DALIANIS and GALWAY, JJ., concurred.