Health Services Planning and Review Board
No. 93-365

APPEAL OF RICHARD G. COURVILLE
(New Hampshire Health Services Planning and Review Board)

November 7, 1994

120

*Sulloway & Hollis,* of Concord (*Eleanor H. MacLellan* and *Douglas D. Byrd* on the brief, and *Ms. MacLellan* orally), for the petitioner, Richard G. Courville.

*Jeffrey R. Howard,* attorney general (*Nancy J. Smith,* assistant attorney general, by brief and orally), for the State.

BROCK, C.J. The petitioner, Richard G. Courville, appeals from the decision of the State Health Services Planning and Review Board (board) denying his request for two six-month extensions of the expiration date of his certificate of need (CON) and of the completion date for a nursing home to be built in Madbury under his CON. Courville's appeal asks whether the board: (1) erred in deciding that the CON, which had been transferred to Courville, retained its original expiration date; (2) failed to consider the statutory factors for showing good cause to extend the completion date of the project; and (3) violated Courville's rights to a fair hearing by considering an undisclosed staff memorandum in its determination of his petition. We affirm.

After determining that a need existed for additional nursing home beds in the Madbury area, the board issued a CON jointly to Exeter Health Services, Inc. and Frisbie Health Services, Inc. (Exeter/Frisbie) on January 29, 1988, to build a 100-bed nursing home in Madbury. Exeter/Frisbie experienced difficulties with the project and requested a change of scope in the CON to change the applicant to the Courville Company, a partnership controlled by the petitioner, who also does business as Courville Management Services, Inc. Following a hearing, the board ordered on October 9, 1990, that "all the stipulations and requirements of [the CON] issued on January 29, 1988 to the Frisbie Memorial Hospital/Exeter Health Resources, Inc. are hereby transferred to The Courville Company." For purposes of this decision, we will refer to the entity holding the CON and the petitioner interchangeably as "Courville."

By statute, the CON holder was required to commence the nursing home project within eighteen months and complete the project within five years of the issuance date of the CON. RSA 151-C:12, I(b)(2) (1990). A dispute between Courville and the board about the expiration date of the CON culminated in the board's July 14, 1992, order imposing an early expiration date unless Courville began construction by July 29, 1992. Courville petitioned

the superior court for declaratory judgment and injunctive relief from the board's order, and also moved the board to reconsider its order. In response, the board stayed its July order and, at its meeting on August 24, 1992, granted reconsideration and ordered that the CON would not expire until January 29, 1993. Courville did not appeal the board's August 24 decision. The action in superior court was eventually stayed pending the outcome of this appeal.

On January 11, 1993, Courville filed a request with the board to extend the expiration date of the CON to give him more time to complete the project. The board held a hearing on Courville's request on January 25, 1993, and issued an order dated March 8, 1993, denying the extension. Courville's attorney became aware of a staff memorandum on the subject of Courville's request for an extension, which had not been provided to Courville at the hearing. Courville requested a rehearing, arguing in part that his due process rights were violated by the board's reliance on the memorandum. The board released a copy of the memorandum to Courville's attorney and granted Courville's request for a rehearing, which was held on April 26, 1993. The board issued an order dated May 24, 1993, which again denied the extension. This appeal followed.

■ As a preliminary matter, we address Courville's motion to strike two parts of the State's brief. He first contends that this court dispositively rejected the State's argument that part of the appeal is untimely when we denied the State's motion for summary affirmance that raised that issue. Courville misunderstands the effect of denying a motion for summary affirmance under Supreme Court Rule 25. Unless the order denying the motion specifically states otherwise, denial of summary affirmance is not dispositive of any issue.

■ Courville next moves to strike the State's argument regarding whether he waived a particular issue, arguing that the issue was properly preserved for review on appeal in proceedings before the board. The State's waiver argument, however, is based on the contention that Courville's attorney explicitly waived the issue at the April 1993 rehearing. That Courville may have properly raised and preserved the issue prior to the April rehearing is irrelevant to the State's argument. Accordingly, we deny the motion to strike. We do not find, however, that Courville's meritless motion fits the extraordinary case of a frivolous or bad faith appeal, and we deny the State's request for attorney's fees under Supreme Court Rule 23.

■■ We turn now to the standard of review for the issues raised in the appeal. RSA chapter 151-C directs that appeals to this court are governed by RSA chapter 541, but also includes a standard of review: "The court shall affirm the decision of the board unless it finds it to be arbitrary or capricious or not made in compliance with applicable law." RSA 151-C:10 (1990). The standards of review provided by RSA 541:13 (1974) and RSA 151-C:10, III (1990) are essentially the same, *see Appeal of Lemire-Courville Associates,* 127 N.H. 21, 23–24, 499 A.2d 1328, 1330 (1985), and both standards apply to appeals from decisions of the board, *Appeal of N.H. Catholic Charities,* 130 N.H. 822, 825, 546 A.2d 1085, 1087 (1988). Therefore, we deem all factual findings by the board to be *prima facie* lawful and reasonable. RSA 541:13. Courville, as the appealing party, bears the burden of showing by a clear preponderance of the evidence that the board's decision was "arbitrary or capricious or not made in compliance with applicable law." RSA 151-C:10, III; *Appeal of Clipper Home,* 133 N.H. 593, 597, 579 A.2d 808, 810 (1990); *see* RSA 541:13.

## I. Expiration Date of the CON

The State argues that Courville did not timely appeal the board's August 24, 1992, decision concerning the expiration date of the CON and, further, that Courville's attorney waived any renewal of the issue at the April 1993 rehearing. Accordingly, the State asserts, the issue of the CON's expiration date should not be considered by this court on appeal. The State also contends that the superior court lacks jurisdiction to consider the issue of the expiration date of the CON.

The issue of the CON's expiration date first arose during correspondence between Courville and the board in April and May 1992. Courville suggested that the five-year completion period for the project should begin on October 9, 1990, the date the CON was transferred to him, rather than on January 29, 1988, the date it was originally issued to Exeter/Frisbie. In May 1992, the board responded that January 29, 1988, was the starting date for both commencement and completion of the project.

In an order dated July 14, 1992, the board set new deadlines for the project. Although the board found that RSA 151-C:12, I(b)(2) required that the project be completed by January 29, 1993, it ordered Courville to obtain financing and begin construction by July 29, 1992, or the CON would be terminated then. The board's July order also required Courville to complete the project by July 29, 1993. Courville moved for reconsideration of the order, and also petitioned the superior court to enjoin the board from terminating

the CON in July 1992 and to declare that the CON would be valid until October 1995, five years after the date of transfer. In response, the board stayed its July order. At its meeting on August 24, 1992, the board reconsidered its July order and ordered that the CON would expire on January 29, 1993. Courville did not appeal the board's August 24, 1992, decision. On June 14, 1993, Courville's declaratory judgment action in superior court was stayed pending the outcome of this appeal.

■ We agree with the State that Courville failed to appeal timely the board's decision of the CON's expiration date. RSA 151-C:10, II (1990) provides that RSA chapter 541 governs appeals from decisions of the board. The board's August 24, 1992, decision was final as to the CON's expiration date. An appeal from that decision should have been filed within thirty days thereafter. *See* RSA 541:6 (1974).

■ Courville's argument that he lacked standing to appeal the board's August 1992 decision is without merit. The "injury in fact" standing requirement raised by Courville is inapposite to his situation. *Cf. Appeal of Richards,* 134 N.H. 148, 156, 590 A.2d 586, 591 (1991). Because he had sufficient interest in the expiration of the CON in July and August 1992 to contest the issue before the board and by petition for declaratory judgment in superior court, he also had sufficient interest in the board's August decision to appeal at that time.

After August 1992, and until Courville filed his request for an extension of the expiration date in January 1993, he had no matters concerning the Madbury project pending before the board. At the January 25, 1993, public hearing on Courville's request for an extension of the CON, he again asserted that it would not expire until five years after the transfer date, but the board ruled that the expiration date had been decided by its August 24, 1992, order. The board voted to deny Courville's request for an extension, but granted a rehearing following Courville's motion. At the rehearing on April 26, 1993, the board chairman and Courville's attorney agreed that the issue of the CON's expiration date was not a subject for the rehearing. Courville's attorney stated: "[W]e have contested that matter [the expiration date] as the chairman knows and that is pending in Merrimack County Superior Court. That is not the subject that we're here about today." The board did not reconsider its August 1992 decision.

■ We discourage piecemeal appeals. Here, however, the board issued its decision on the CON's expiration date in August 1992. No further proceedings by Courville were then pending before the

board. Therefore, the board's August 1992 decision was a final decision that began the statutory appeal period.

Courville did not file an appeal with this court until June 1993, long after the thirty-day filing period provided by RSA 541:6 had expired. Consequently, Courville's appeal of the decision with respect to the expiration date of the CON, being untimely, is dismissed. *See LaCroix v. Mountain,* 116 N.H. 545, 546, 366 A.2d 486, 486–87 (1976).

■ Even if we assume that the question of the CON's expiration date had been renewed at the January 1993 hearing, Courville's attorney waived reconsideration of that issue at the rehearing. A motion for reconsideration is a necessary predicate for appeal. RSA 541:4; *In re Petition of McHale,* 120 N.H. 450, 451, 418 A.2d 1268, 1268–69 (1980); *see also Appeal of Richards,* 134 N.H. at 157, 590 A.2d at 591–92. Therefore, because Courville waived reconsideration of the board's decision on the expiration date at the April 1993 rehearing, that decision was not appealable.

We decline to consider the jurisdiction of the superior court over the declaratory judgment action instituted by Courville. No final decision has been rendered by the superior court, *see* SUP. CT. R. 3, and neither party has filed an interlocutory appeal or transfer, *see* SUP. CT. R. 8, 9.

## II. Courville's Request for Extension of the CON

■ A CON will expire upon failure to complete the authorized project within the time specified by statute, which for Courville, was five years. RSA 151-C:12, I. Courville applied for two six-month extensions of the completion date. RSA 151-C:12, II (1990) provides the following requirements for an extension of the completion date of a project:

> Upon a showing of substantial, diligent progress and good cause by the person proposing the project, the board shall grant up to a maximum of 2 extensions of 6 months each for completion of the project. For purposes of this paragraph, "good cause" includes delay resulting from unpreventable or unexpected occurrences, such as emergency, strike, disaster, unforeseen shortage of materials or other reasonably unforeseeable event.

To be successful, therefore, an applicant for an extension of the completion date must show both "substantial, diligent progress" on the project *and* "good cause" for granting the extension. We need not consider whether Courville satisfied the first requirement

because we uphold the board's ruling that Courville failed to show "good cause."

Courville maintained in his extension request that he satisfied the "good cause" requirement because of delays he had experienced in obtaining financing through the United States Department of Housing and Urban Development (HUD) caused by unpreventable or unexpected occurrences. Following the January hearing, the board ruled that Courville failed to show that delays in obtaining financing were due to unpreventable or unexpected occurrences. Specifically, the board found that Courville "has dealt with HUD in the past and is sufficiently aware of the requirements and time constraints involved in working with this agency." In addition, the board examined Courville's claim that further delay was caused by the board's failure to sign a HUD form that was a prerequisite for financing through HUD. The board decided that not signing the form was justified based on the uncertainty of Courville's financing plan and questions about who would actually construct the project authorized by the CON issued to Courville. The board concluded that Courville had not shown "good cause" to grant an extension of the completion date for the project and denied the request.

The board granted Courville's request for a rehearing to reconsider the board's January 25, 1993, decision based in part on Courville's concerns about the effect on the board's decision of a confidential staff memorandum provided to the board before the first hearing. At the rehearing, Courville offered a new proposal in support of his request for an extension, that if the board would grant a twelve-month extension, he would begin active construction within seven business days and would complete the project within the twelve-month extension. As part of the proposal, Courville agreed that if he did not begin active construction within the seven days as promised, he would not appeal the board's order if it terminated the CON at that time. The board denied the extension. In its order dated May 24, 1993, the board found that the delays in the project were not caused by the board's failure to sign the HUD form, and that the transactions for financing and beginning construction of the project were not complete. Significantly, the board also found that HUD would require the board to condition the terms of the CON so that it would be issued to and held by the nursing home facility authorized by the CON rather than by Courville who was responsible, under the terms of the CON, for completing the authorized project. The board held that HUD's requirement would violate RSA chapter 151-C.

On appeal, Courville argues that the board erred because it failed to follow the statutory definition of "good cause" and

considered factors that were not relevant to that determination. Specifically, Courville points to the board's consideration of the method of financing planned by Courville, the planned ownership structure of the property where the project was to be constructed, and the interest of other nursing home providers in the CON. He also relies on the board's rulings in other cases that delays in financing constituted "good cause" for extensions of the *commencement* date of projects. Courville contends that he presented undisputed evidence showing that HUD's changes in underwriting standards forced Courville to restructure the financing plan, causing delays due to unpreventable or unexpected occurrences within the statutory standard of "good cause." Consequently, Courville maintains, the clear preponderance of the evidence supports a showing of "good cause" for his requested extension. We disagree.

Courville's reliance on the board's previous extensions of the *commencement* date of projects under RSA 151-C:12, II because of delays in obtaining financing to support his request to extend the *completion* date of his project is misplaced. The circumstances involved in beginning a project are sufficiently different from completing a project to explain differing interpretations of "good cause" in those contexts.

RSA 151-C:12, II lists "emergency, strike, disaster, [and] unforeseen shortage of materials" as examples of "unpreventable or unexpected occurrences" that would constitute "good cause." A delay in obtaining necessary financing generally would not constitute an unpreventable or unexpected occurrence within the meaning of RSA 151-C:12, II, and would not establish "good cause" to extend a project completion date. Further, a CON holder's inability to obtain viable financing is not an unforeseeable *delay* in the completion of a project, but, instead, is a factor that may *prevent* construction or completion of the project. When a project involves a significant financial commitment, delays in financing should be anticipated, while the failure of financing or insoluble complications in financing render the project an impossibility. Only unique, unforeseeable circumstances that *delay* financing will fulfill the "good cause" requirement, particularly for an extension of the completion date. Therefore, by asserting that HUD's procedures and underwriting changes delayed financing for the project and thereby constituted "good cause" for granting an extension, Courville bore the burden of showing that HUD acted as alleged, that HUD's actions delayed the project requiring the extension, that the project was viable, and that HUD's actions were unforeseeable. *See* RSA 151-C:12, II.

At the January hearing, one of Courville's attorneys explained that part of the delay in the financing process was that Courville submitted his application to HUD when "HUD kind of went ballistic in both the local and national political scene." As a result, she said, HUD was shorthanded and had to send Courville's application to an independent contractor for processing, delaying HUD's response. She also mentioned that a problem with the banks had a significant impact on Courville's attempts at financing the project. At the April rehearing, Courville testified that problems in obtaining financing were caused by the banking crisis at the time the CON was transferred to him, and he said that HUD had been very cooperative.

Another of Courville's attorneys explained at the April rehearing that underwriting changes at HUD required Courville to provide more financial information than he had previously provided to obtain financing directly from HUD on other projects. The attorney explained that Courville had decided that obtaining necessary financing from HUD directly would be difficult because some of his nursing home operations were not profitable, and that he had concluded that he would need a third person in the project to assist with financing.

The board properly considered Courville's method of financing the project. Courville raised the issue of the method of financing by claiming that HUD's underwriting changes had delayed financing. The board had to assess the project's financing plan in order to determine whether unforeseeable events delayed obtaining financing and delayed the project, or whether the project, due to other reasons, was not viable. "Good cause" for an extension of the completion date for the project would not be established, for example, by showing that the CON holder's continuing financial instability prevented financing the CON project. The bulk of the testimony at both the hearing and the rehearing addressed the viability of the project: whether Courville was ready to begin construction of the project and whether he would be able to complete the project.

The ownership structure of the nursing home project was also an appropriate consideration for the board in evaluating the project's condition and progress and whether financing problems or other circumstances had delayed its completion. Courville argued that underwriting changes at HUD caused him to negotiate with another investor in order to satisfy HUD's financing requirements. The board, therefore, asked questions and heard evidence about Courville's financing structure. Courville also argued, in part, that the board's delay in signing the HUD form had delayed his

financing. To address that argument, the board considered the requirements of the HUD form, which involved who would own the nursing home facility, who would operate the nursing home, and whether the CON would be held by the facility or by Courville personally.

Although Courville contends that the board improperly considered the interests of other nursing home care providers in building a facility in the Madbury region when it made its decision to deny the extension, he has not shown any factual basis for his contention. In its order following the hearing, the board noted its mandate pursuant to RSA 151-C:1, III (1990), to stimulate competition in providing health care as a means of controlling health care costs and found that the needs of the Madbury region would be better served by renewing competition to provide the facility. Having found no other reference to other nursing home providers in the board's orders, we are unpersuaded by Courville's suggestion that consideration of the interests of other providers guided the board's decision.

 The board concluded that delays in the project had been caused by uncompleted transactions among the parties involved in the project. After extensive questioning and testimony at both the hearing and rehearing, the board determined that HUD would require the board to condition the CON so that it would be issued to the nursing home facility rather than Courville. The board decided that it could not condition the CON as required by HUD. Based on the history of delays with the project and the testimony at the hearings, the board was unconvinced that Courville would be able to complete the project within twelve months as promised. After a thorough review of the record and the arguments presented by Courville, we find that the board adequately considered the factors required by RSA 151-C:12, II in its decision to deny Courville's request for an extension, and did not consider irrelevant factors in making its decision. The board's decision complies with applicable law and is neither arbitrary nor capricious.

## III. Fair Hearing

At the January 25 hearing, the board considered and relied on information from a confidential staff memorandum in deciding to deny Courville's request for an extension. The memorandum was not given to Courville and was not made a part of the record of the hearing. Following the hearing, Courville's attorney requested and the board provided a copy of the memorandum. Courville raised

concerns about the memorandum and the board's use of it in his motion for rehearing, which was granted.

On appeal, Courville maintains that the board's treatment of the memorandum violated New Hampshire administrative procedure statutes prohibiting *ex parte* communications, its own administrative rules, and the due process guarantees of the State and Federal Constitutions. He argues that he was prejudiced by the board's actions because he was not given an opportunity to respond at the hearing to the opinions and factual assertions in the memorandum. Courville also contends that the prejudice was not cured by the rehearing because the board did not fairly consider the rebuttal evidence.

The confidential staff memorandum was prepared by the assistant director of the office of health services planning and review. The assistant director reviewed the background of Courville's project and expressed his negative opinion about the merits of Courville's request for an extension. In addition, the assistant director contacted HUD concerning the project's financing and the HUD form the board was asked to complete, and reported the information he received. In summary, the memorandum contained facts and opinions that were not disclosed to Courville until after the hearing.

Courville relies on New Hampshire Administrative Rules, He-Hea 205.09(o), to support his contention that the board's own procedural rules required the board to disclose the memorandum to him and allow him a fair and timely opportunity to respond. Rule 205.09(o) establishes procedure for presenting and cross-examining witnesses at a hearing but does not address the circumstance of information that is supplied outside of the hearing process. Because the board's use of the memorandum did not involve Rule 205.09(o), we find no violation.

The board's use of the memorandum may have violated RSA 541-A:21 (Supp. 1993), the *ex parte* communications provision of the Administrative Procedure Act. *Ex parte* communications are prohibited to prevent "information not presented in the presence of both parties from *influencing the agency's decision.*" *Appeal of Atlantic Connections,* 135 N.H. 510, 516, 608 A.2d 861, 866 (1992). Although RSA 541-A:21 contains exceptions for certain agency communications, the memorandum does not appear to fit within them. To set aside the board's decision based on a violation of RSA 541-A:21, however, we must find that the board's use of the memorandum caused material prejudice to Courville. *Appeal of Concord Natural Gas Corp.,* 121 N.H. 685, 691, 433 A.2d 1291,

1295 (1981). We find that any prejudice caused by the use of the memorandum at the hearing was cured by the rehearing.

Courville charges that the rehearing was a "sham" because the board scarcely allowed him to refute the evidence in the memorandum and did not fairly consider the evidence that he presented. To support his claim, Courville first points to an exchange between board members and one of his attorneys at the rehearing. The attorney explained that he was there to clarify certain statements that were made in the memorandum. The board asked him to identify the statements and he responded:

> There are . . . there are three primary issues which I will go through. One is whether HUD financing was in fact available at the time of the request for extension hearing; whether Mr. Courville has made good faith efforts to obtain financing over the twenty-seven months that he's had this transfer . . . .

At that point, the chairman interrupted, saying, "We've heard that, we've heard all about his efforts to retain financing. Do you want to hear it again? Any member of the board?" Two members said they did not and a third member suggested that they get on with the hearing. The attorney continued his presentation, providing information and materials to clarify the ownership and financing structure of the project and a letter to the board from HUD to correct allegedly erroneous factual information contained in the memorandum about Courville's financing structure and the form the board was asked to sign.

The record shows that Courville himself, his attorneys, and a representative from the lending bank had presented information about Courville's financing arrangements before the exchange between one of his attorneys and members of the board. In the context of the testimony at that point in the rehearing, it is likely that the board members were noting that the subjects the attorney proposed to discuss had been covered previously, rather than that they were attempting to limit the attorney's presentation on Courville's behalf. The hearing proceeded after the exchange with the attorney, and the board heard additional testimony from the bank representative explaining his understanding of HUD's requirements as to the CON, Courville's attorneys and Courville himself providing further information about the financing arrangements. In fact, the transcript of the rehearing continues for thirty-five pages of testimony by Courville's representatives and their discussions with the board, as well as a page of Courville's

own testimony. Courville has not shown that the board limited his presentation of evidence at the rehearing.

Courville also argues that board members' questions at the rehearing about why the board was considering evidence from Courville to refute the memorandum shows that the board did not fairly consider the evidence presented at the rehearing. He points to uncertainty expressed by some board members about the procedural issue of disclosing and addressing the memorandum to demonstrate that the board refused to consider any of the evidence provided. The record does not support Courville's position. Indeed, the discussion during the rehearing and among board members following the rehearing, as well as the board's order, indicate that the board carefully considered the testimony and the evidence presented.

We hold that any material prejudice caused by the board's use of the memorandum at the first hearing was cured by the rehearing. *See Appeal of Salem Regional Med. Ctr.,* 134 N.H. 207, 220, 590 A.2d 602, 610 (1991). Because any harm caused by the alleged procedural infirmities in the hearing was cured by the rehearing, the board's procedures did not violate Courville's due process rights. We affirm the decision of the board.

*Affirmed.*

All concurred.