Health Services Planning and Review Board
No. 97-586

APPEAL OF THE NEW ENGLAND HEART INSTITUTE AND MAINE MEDICAL CENTER

(New Hampshire Health Services Planning and Review Board)

December 29, 1999

*Sheehan Phinney Bass & Green, P.A.*, of Manchester (*William J. Donovan* on the brief and orally), for the petitioners.

*Orr & Reno, P.A.*, of Concord (*John A. Malmberg & a.* on the brief, and *Mr. Malmberg* orally), for respondent Portsmouth Regional Hospital.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Eugene M. Van Loan III* on the brief and orally), for respondent Concord Hospital.

PER CURIAM. The petitioners, New England Heart Institute (NEHI) and Maine Medical Center, appeal the decision of the health services planning and review board (board) granting certificates of need (CONs) to the respondents, Portsmouth Regional Hospital and Concord Hospital, to allow new cardiac surgery programs. The petitioners contend that the board erred in issuing the CONs because: (1) the regulations for cardiac surgery are legally deficient; (2) the board failed to determine that need existed for additional cardiac surgery services before issuing a request for applications; (3) the CONs issued to the respondents were fundamentally inconsistent with a prior CON; and (4) a board member failed to recuse himself early in the CON process thereby tainting the proceedings. Because we agree that the board failed to determine that need existed before issuing a request for applications, we remand.

In 1996, Concord Hospital solicited a Request for Applications (RFA) for new cardiac surgery programs from the board. The board voted to issue an RFA. NEHI informed the board that, in its opinion, the regulations failed to recite a clear test to determine need for the issuance of an RFA as required by RSA 151-C:6 (1996 & Supp. 1999) and asked the board to clarify whether it had found need. In response to the requested clarification, the board decided to continue with the RFA process, and Concord Hospital and Portsmouth Regional Hospital submitted applications to obtain CONs. The petitioners filed for and received intervenor status. The CONs were issued to the respondents, and the petitioners filed a motion for rehearing and reconsideration, which was denied. This appeal followed.

Our review of the board's decision is governed by RSA 541:13 (1997), which states that the board's decisions "shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable." RSA 151-C:10, III, however, requires that "[t]he court shall affirm the decision of the board unless it finds it to be arbitrary or capricious or not made in compliance with applicable law." We have held that these standards of review "are essentially the same, and both standards apply to appeals from

decisions of the board." *Appeal of Courville*, 139 N.H. 119, 123, 649 A.2d 1233, 1236 (1994) (citation omitted). Accordingly, "we deem all factual findings by the board to be prima facie lawful and reasonable . . . [and the petitioners] bear[] the burden of showing by a clear preponderance of the evidence that the board's decision was arbitrary or capricious or not made in compliance with applicable law." *Id.* (citation and quotation omitted).

The CON process is governed by RSA chapter 151-C. RSA 151-C:4 (1996 & Supp. 1999) states:

I. No new institutional health service shall be offered or developed within the state . . . except pursuant to obtaining a certificate of need for such service.

II. No certificate of need shall be granted by the board unless a standard has been developed which delineates the need for the service and outlines the criteria which must be met by any person proposing such a service.

The board is required to establish standards for each of the six types of new institutional health services listed in RSA 151-C:5, II including "[t]he development and offering of new inpatient services," which covers the additional cardiac surgery services at issue here. RSA 151-C:5, II(c) (1996). When there is no existing standard, the board must develop a standard for new institutional heath services that "shall be either a standard allocating the new service by number, type, and location or a statement that the proposed new service is in the best competitive interest of health care in the state." RSA 151-C:6, II(e) (1996). RSA 151-C:8, I(a) (1996) further provides:

I. If a standard developed through RSA 151-C:5 or 151-C:6 indicates a need for additional health services, the board shall issue a request for applications. . . . At a minimum the notice shall include:

(a) A brief description of the service to be provided, including the amount, type, and location as established by the standard.

Thus, the board must first determine that a need, as defined by a standard, exists in order to issue an RFA. If an RFA issues, the board can only issue a CON to an applicant if the applicant has shown that it meets the CON requirements, defined by statute and regulations.

■ At the outset, for clarification, we note that all of the regulations referred to by the parties have undergone revision,

expiration, or reenactment since this case was first submitted. The regulations that were in effect at the time of the board's decision are the regulations that we look to in deciding this appeal.

The petitioners first contend that the board's regulations for cardiac surgery in 1996, then found in New Hampshire Code of Administrative Rules, Parts He-Hea 1108-1110 (effective September 27, 1991; expired September 27, 1997), are legally deficient because they do not delineate a need standard for cardiac surgery programs by "number, type, and location" as required by RSA 151-C:6, II(e). The parties discuss two particular regulations as possibly qualifying as a need standard: He-Hea 1108.03 and 1108.04. The respondents, however, concede that He-Hea 1108.03 is not a need standard. Therefore, we turn to He-Hea 1108.04, which the respondents contend is the applicable standard.

He-Hea 1108.04 provides:

(a) Each new adult open heart surgery program shall assure that the proposed volumes of service shall not be detrimental to the existing health care system of the state.

(b) No new adult open heart surgery program shall be approved unless it can be demonstrated that the proposed program can retain the number of patients needed to assure a minimum volume of 250 cases annually per facility.

(c) No new service shall be approved if the introduction of any new services cause the volume in each facility dedicated for adult open heart surgery in the State to drop below 350 adult open heart surgery cases per year.

The petitioners contend that the need standard set out in He-Hea 1108.04, referred to by the parties as a volume standard, is not a need standard but rather a standard to evaluate if a particular application should receive a CON. The basis for this contention is that "[t]his initial determination of Need [when deciding to issue a RFA] is *always* based upon readily available historical data or information . . . which is essentially free from challenge or dispute . . . and *never* based upon projections or estimates." Additionally, the petitioners contend that a need standard does not evaluate individual applicants but rather assesses need based on a regional or statewide analysis. As support for this allegation, the petitioners list a variety of need standards that they argue demonstrate the clear and regional or statewide nature of such standards.

The petitioners' reliance on other need standards to demonstrate the inadequacies of He-Hea 1108.04 is misplaced. The correct

starting point to determine whether He-Hea 1108.04 meets the requirements of RSA 151-C:6, II(e) is the language of RSA 151-C:6, II(e) itself. The board, pursuant to RSA 151-C:6, II(e), develops a standard to determine need by "number, type and location." The language of He-Hea 1108.04 fulfills these requirements. The number of cardiac surgery programs is any number of programs that can demonstrate that they can service a minimum of 250 patients per year. The type of service is new adult open heart surgery services. Location of any new service is defined by requiring that the new service not be in a location where it will reduce the volume of patients at an existing hospital below 350 patients a year. Thus, He-Hea 1108.04 meets the need standard requirements of RSA 151-C:6, II(e).

The petitioners point to no statutory requirement that all need standards developed by the board define need in an identical way. While all need standards must define need in relation to number, type, and location, as prescribed by RSA 151-C:6, II(e), the board is free to meet these requirements in a variety of ways.

■ Additionally, the petitioners contend that He-Hea 1108.04 cannot be a need standard because the board previously ruled in 1992 that this regulation was not a need standard. Our review of the record, however, does not support the petitioners' contention. In 1989, the board operated under different regulations for determining the need for new cardiac services. See N.H. ADMIN. RULES, Parts He-Hea 1101, 1104-1105 (effective July 25, 1988; superseded August 23, 1990); N.H. ADMIN. RULES, Parts He-Hea 1102-1103 (effective October 21, 1987; superseded August 23, 1990). Under He-Hea 1105.01, an RFA was issued annually without a prior finding of need. See N.H. ADMIN. RULES, He-Hea 1105.01. Portsmouth Regional Hospital was one of two hospitals that responded to the automatic RFA and attempted to obtain a CON. The board declined to issue a CON. The board did discuss a volume requirement similar to He-Hea 1108.04, then found in He-Hea 1102.03, but that discussion must be evaluated in context. The board was not deciding whether need existed to issue an RFA. Instead, the board was determining whether a CON should issue to Portsmouth Regional Hospital. As the petitioners themselves argue, finding need to issue an RFA is separate from finding need to grant a CON.

We have examined the petitioners' remaining arguments regarding whether or not He-Hea 1108.04 constitutes a need standard and find them to be without merit. See Vogel v. Vogel, 137 N.H. 321, 322, 627 A.2d 595, 596 (1993).

We note that our decision should not be read as conclusively determining that He-Hea 1108.04 is the need standard for new cardiac services. We decide only that this regulation meets the statutory requirements to be such a standard. It is the board's responsibility to develop such standards.

Next, the petitioners allege that the board failed to make a determination of need before issuing an RFA as required by RSA 151-C:8, I. We agree.

Under RSA 151-C:8, I, "[i]f a standard developed through RSA 151-C:5 or 151-C:6 indicates a need for additional health services, the board shall issue a request for applications." Additionally, New Hampshire Administrative Rules, He-Hea 1110.01(a), entitled "Issuance of Request for Applications," states that "[i]n accordance with RSA 151-C:8 requests for applications shall be issued if a need has been delineated for additional open heart surgery service pursuant to this Chapter."

The record does not indicate that the board made any finding of need, let alone a finding of need with reference to He-Hea 1108.04 or any other standard. *See Appeal of Nashua Brookside Hosp.*, 138 N.H. 105, 109, 636 A.2d 57, 59 (1993). At the board meeting on September 26, 1996, a motion was made and seconded to issue an RFA. A discussion ensued as to the prerequisites to issuing an RFA, followed by a 3-2 vote to issue an RFA. In response to questions raised by Optima, the parent company of NEHI, a second meeting was held on November 13th at which the board discussed the significance of its prior vote.

The respondents contend that three members of the board who voted to issue an RFA did so because the volume standard was met. The record, however, does not support this contention. While some of the board members referenced the volume standard at the September 1996 meeting, it is far from clear that the board was using the volume standard to determine whether or not need had been shown.

> Chairman [Schwartz]: . . . . [I]t seems to me what's before the Board, at least partly, is a presentation that says, we can do this, if not better or cheaper, in the same area without affecting other programs to a harmful level. Is that enough in the public good to want to open it up and take a look at it, to go forward and grant it.
>
> . . . .
>
> Mr. McKerley: But one of the purposeful reasons of this Board is to control escalating prices.

Mr. Eaton: Absolutely.

Mr. McKerley: And, would this — would something like this, while maintaining quality, help control the prices? That's the big question in my mind —

. . . .

Mr. Wallace: . . . . The two fifty [the volume standard], and all that, is not the need question to me. That is, if. there is a need, then the program has to come in and demonstrate that it can do all these other things. So, the two fifty is irrelevant for the question I'm asking, which is, is there something in the statutes, specific, as to when we decide that there is a need, either based on accessibility, cost, or any other standard?

. . . .

Mr. Marcille: And, if I could — you know, I think we had someone that's come to us, and said that they meet the number requirement, and that they would like the opportunity to demonstrate the cost, accessibility, quality — the other three — the three criteria. And, I think our decision is whether or not we give them the opportunity to make that case . . . .

Moreover, the board's own subsequent discussion of its vote at the November 13th meeting casts substantial doubt on whether or not the board had ever voted that a need had been shown.

Mr. Eaton: If I'm — I think I'm right, then I don't think this Board determined there was a need. It is my understanding out here we wanted to let you people prove there was a need. And we didn't make the decision there was a need. And if there's a need out there, we're willing to take applications (inaudible remarks).

Chairman Schwartz: I think that, that you're right, that the applications will have to show the need.

Mr. Eaton: But it is not for the Board to determine.

. . . .

Mr. Eaton: . . . . And I just want to (inaudible) in my mind . . . and the Board's mind that there was not a determination of need, but we're willing to establish that there was a need.

. . . .

> Mr. Wallace: Well, this was an issue which I spoke to because I was concerned about the thing as to whether or not there had been a need established in accordance to the rules. . . . So at best I would say that the Board may have determined there was a need based on that general authority in the statute rather than something specific in the rules. . . .

> Chairman Schwartz: I know that it caused Mr. Wallace some concern when my memory is the same as his, but it is in this case.

The respondents contend that "[t]he views of these dissenting individuals . . . are only evidence of disagreement of the existence of need, not the absence of a finding of need." We disagree. The record indicates that the board was confused as to what had to be established in order to issue an RFA and whether or not its vote indicated a finding of need. We agree with the respondents that the board is not required to make a definitive finding of need before issuing an RFA, but it is required to find some level of need was demonstrated by application of a particular standard. *See Appeal of Nashua Brookside Hosp.*, 138 N.H. at 109, 636 A.2d at 59. Based on the confusing nature of the board's initial vote that need existed to issue an RFA and the board's subsequent discussion of its vote, we are unable to say that the board made a finding of some level of need with reference to a standard or that they even voted that need existed.

The respondents contend that the minutes of the November 13th meeting demonstrate that the board reaffirmed the finding of need to issue an RFA. We agree that the minutes do indicate this. The minutes' summary of the meeting, however, cannot trump the actual discussion held at the meeting. A review of the transcript of that meeting demonstrates that the board was not sure that it had voted to find need, let alone that it had done so with reference to a standard.

The respondents also contend that because the petitioners were not materially prejudiced, any procedural irregularities of the board's vote are irrelevant. Assuming that a showing of material prejudice is required, we conclude that the board's failure to vote that need existed to issue an RFA is more than a procedural irregularity. The board failed to follow its statutory mandate and in doing so "frustrate[d] the statutory scheme of carefully developing

standards for new institutional health services and granting CONs designed to implement them." *Appeal of Nashua Brookside Hosp.*, 138 N.H. at 109, 636 A.2d at 59.

■ Although we are remanding the board's decision, we will address one of the petitioners' remaining arguments in the interest of resolving this matter as expeditiously as possible. *See Chellman v. Saab-Scania AB*, 138 N.H. 73, 80, 637 A.2d 148, 152 (1993). The petitioners contend that even if the board correctly followed the statutory framework it was precluded from issuing CONs to the respondents because the board had earlier granted a CON to Optima that allowed the relocation of a cardiac surgery program from Catholic Medical Center to Elliot Hospital. The essence of petitioners' argument is that by granting the CONs to respondents, the petitioners' volume of procedures will be reduced by forty percent, which will in turn decrease their profits. Assuming that this is true, the petitioners do not present any statute or regulation that prevents the board from issuing a CON to one hospital merely because it will reduce the present volume of procedures at another hospital. The petitioners appear to be taking the position that once the board granted them a CON and thereby allowed them to invest a large amount of money, the board was required to protect the petitioners from any other competitors. The only limitation on the board when the CONS were issued in this case was that a new facility could not reduce the number of procedures at an existing facility to below 350 procedures a year. *See* N.H. ADMIN. RULES, He-Hea 1108.04 (effective September 27, 1991; expired September 27, 1997). The petitioners' own numbers indicate that out of the 1200 cases performed annually, 440 cases will go to the respondents. This still leaves the petitioners performing more than 350 procedures a year, and thus the CONs to the respondents would not be invalid for this reason.

We therefore hold that the board erred as a matter of law in not following the statutory procedures established by the legislature. On remand we instruct the board to: (1) clearly delineate what need standard applied in 1996 for new cardiac surgery programs; and (2) apply that standard and determine if need existed in 1996 to issue an RFA. These instructions make the petitioners' remaining arguments and the respondents' motion to strike portions of the petitioners' reply brief moot. We therefore remand this matter to

the board for action consistent with this opinion. We otherwise retain jurisdiction of the appeal.

*Remanded.*

THAYER, J., sat but did not participate in the decision; the others concurred.